Filed 12/19/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S118629 |
| v. | ) | |
| | ) | |
| ROBERT LEE WILLIAMS, JR., | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. CR64075 |
| _____ | ) | |

Defendant Robert Lee Williams, Jr., was convicted by a jury of two counts of first degree murder (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated), one count of attempted murder (§§ 187, 664), and one count of sexual penetration with a foreign object (§ 289, subd. (a)). The jury found true the special circumstance allegations that defendant committed multiple murders (§ 190.2, subd. (a)(3)) and committed the murders during the commission of robbery (§ 190.2, subd. (a)(17)), burglary (§ 190.2, subd. (a)(17)), and torture (§ 190.2, subd. (a)(18)). The jury also found true the allegations that defendant personally used a firearm (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)) and inflicted great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). Following the penalty phase trial, the jury returned a verdict of death.

This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

1

# I. FACTS

## A. Guilt Phase

### 1. Prosecution Case

On the night of July 15, 1995, defendant and two accomplices entered the residence of Gary Williams and robbed and murdered him and his father, Roscoe Williams. (Because the victims and defendant share the same surname, we refer to the victims by their first names. The victims were not related to defendant.) The men also sexually assaulted and attempted to murder Gary's girlfriend, Conya L., but she escaped through a bedroom window.

#### a. *Robert Scott*

Robert Scott testified that he and Gary, working together, had committed over 20 armed robberies of credit unions during the early 1990s. On July 4, 1995, Scott and Gary were sitting in Gary's truck when defendant pulled up alongside in his car. Defendant got out of his car, grabbed Gary, and pressed a black nine-millimeter semiautomatic handgun against Gary's neck, saying, "I know you niggers out there getting licks and I want my share of the money." Scott testified that the term "lick" describes the proceeds gained from a completed robbery. Defendant threatened that if Gary failed to meet his demand, defendant would kill Gary and his family.

Gary and Scott decided to rob a credit union so they could pay defendant and make money for themselves. On July 10, 1995, the men robbed an Orange County credit union. Gary provided the guns and acted as the lookout while Scott and another man, Curtis Jackson, entered the credit union and stole $56,000. Scott and Jackson were captured following a high-speed police chase, but Gary fled in a different car and escaped.

b.    *Conya L.*

Conya L. testified that she and Gary had been romantically involved for about a year, and that she was aware Gary made his living robbing credit unions. On the evening of July 15, 1995, Conya L. and Gary went out to dinner. As they drove back to Gary's home in Moreno Valley, Gary informed Conya L. that he needed to hurry back to the house because he had a meeting. Conya L. understood that Gary was meeting Ronald Walker, who was known as "Boochie" or "Black," to buy a gun. As they turned onto Gary's street, they drove past a burgundy vehicle.

Upon arriving at Gary's house, Conya L. observed that Gary's father Roscoe was waiting outside. The group entered the house, and Conya L. went upstairs. From the master bedroom, she overheard Gary and Roscoe talking downstairs. Roscoe said he was going to the store and asked Gary for money. Gary gave Roscoe some money, and Roscoe left for the store.

From the bedroom window, Conya L. saw three men — defendant, Ronald Walker, and a third man who was never identified or prosecuted (third perpetrator) — leave a burgundy sedan and walk across the street toward the house. Defendant was carrying a black case. As the men approached, Conya L. heard Gary say, "Man, you didn't see me and my girl? We passed you." One of the men replied: "Nah, nigger. I was rolling a joint." When the three men and Gary went inside the garage, Conya L. could hear "mumbled" talking.

Shortly thereafter, Walker appeared in the master bedroom and pointed a gun at Conya L. Walker was wearing a pair of yellow dishwashing gloves but no mask. He was soon joined by defendant, who was also wearing yellow dishwashing gloves but no mask. Defendant ordered Conya L. to remove all of her jewelry, which he then stuffed in his pocket. Because the suspects were wearing gloves but not masks, Conya L. believed they intended to kill her.

3

Defendant asked Conya L., "bitch where's the money?" When Conya L. said she did not know, defendant directed Walker to tie her up. Walker bound Conya L.'s hands behind her back with duct tape, and defendant used a lamp cord to tie her ankles. Defendant threatened to rape and kill Conya L. if she failed to disclose the location of the money. The third perpetrator, also wearing yellow dishwashing gloves and no mask, then came upstairs and discussed stealing Gary's clothes and shoes. Defendant told him to go back downstairs to "stay on duty." Defendant then ransacked the master bedroom, stealing gold chains and jewelry.

Eventually Roscoe returned from the store and called for Gary to let him in. Defendant instructed the third perpetrator to "snatch his ass in the house." Conya L. heard the front door open and defendant command, "get the fuck in here, old man. Don't you say a motherfucking word." The door slammed closed.

Defendant ordered his cohorts to bring Gary and Roscoe upstairs. Gary and Roscoe, with their hands and feet bound, were dragged upstairs and laid in the hallway; Conya L. observed that Gary's eye was bloody and swollen shut. Gary disclosed that money was hidden in a cologne bag in the master bathroom. Dissatisfied with the amount found in the bag, defendant said: "That ain't all the money . . . . Gary just hit two banks back to back."

Defendant then forced Conya L. into a bathroom. He shut the door, instructed Conya L. to remove her shorts, and pulled down her underwear. He then removed one of the yellow rubber gloves and, using up to three fingers, digitally penetrated Conya L.'s vagina several times. Defendant paused when Gary called asking to speak with him. During the encounter, Gary referred to defendant as "Rob." Upon exiting the bathroom, defendant said to the others: "Do his old man in front of him."

The third perpetrator went downstairs and returned with brown plastic trash bags. He drew one of the plastic bags tightly over Roscoe's head. Conya L.

testified that at that juncture, Roscoe did not appear to have been gagged with duct tape. Walker placed Gary in a choke hold and began choking him. Defendant then grabbed Conya L. and placed her in a choke hold, rendering her unconscious. Conya L. testified she felt like she was in a dream state as she lay face up on the ground with defendant leaning over her, cutting her throat with a knife. Defendant complained that the straight-edge knife was dull and ordered the third perpetrator to get him a serrated one. Defendant then began cutting Conya L.'s throat with the serrated knife. At that point, the phone rang. Conya L. saw beams from a car's headlights suggesting that a car was in the driveway.

All three men went downstairs, leaving Conya L. alone. Conya L. dialed 911, but upon hearing the men coming back upstairs, she left the 911 connection on, climbed out the window, and jumped to the ground below. Naked from the waist down, Conya L. ran from the house. After crying for help, she eventually lay down in the street, and police found her a short time later.

c. *Deputy David Glen Kirkendall*

Riverside County Sheriff's Deputy David Glen Kirkendall testified that he responded to the 911 call and arrived at Gary's house just before 11:00 p.m. Upon arriving, Deputy Kirkendall knocked on the front door. When no one responded, he opened the garage and saw a pool of blood. He contacted police dispatch to report his finding and was informed that the office had received numerous 911 calls regarding a woman in distress. Deputy Kirkendall hurried around the block and saw Conya L. naked and "covered in blood." When Conya L. pulled her hand away from her throat, blood began pouring out.

d. *Michelle Contreras*

Gary's across-the-street neighbor Michelle Contreras testified that on the night in question she observed four cars rapidly accelerate away from Gary's house in the same direction of travel. One of the cars was Gary's Chevy Cavalier,

5

and another was an El Camino that Gary had been storing for a friend. The Cavalier and El Camino were recovered by police in the following days, and yellow dishwashing gloves were found inside the El Camino.

e. *Sheriff's Investigator Brian Robert Fountain*

Riverside County Sheriff's Investigator Brian Robert Fountain testified that law enforcement personnel found the bound bodies of Gary and Roscoe inside Gary's home. Both victims' mouths were covered with duct tape. Two knives, one serrated and one with a dull straight edge, were recovered near the bodies. An empty black gun case was found in the street in front of the house. By stipulation, the parties agreed that neither defendant's nor Walker's fingerprints or palm prints were found in the house or on the gun case. Nor did any of the shoeprints located in the house match any of the shoes subsequently confiscated from defendant or Walker. Additionally, neither defendant's nor Walker's fingerprints were found on the yellow rubber gloves that were discovered inside the El Camino.

f. *Forensic Pathologist Joseph H. Choi, M.D.*

Riverside County Forensic Pathologist Joseph H. Choi, M.D., conducted the autopsies of Gary and Roscoe. Dr. Choi testified that neither victim's body exhibited defensive wounds. Gary's neck exhibited five nonfatal superficial cuts and a single stab wound that penetrated nearly two inches. Dr. Choi opined that the cause of death was blood loss due to a partially severed jugular vein, which in turn caused cardiovascular failure. Roscoe's neck exhibited a deep slash wound that had fully severed his jugular vein and larynx. Dr. Choi opined that the cause of death was blood loss causing cardiovascular failure. Dr. Choi further opined that the duct tape was applied to each victim's mouth before he was fatally slashed or stabbed.

6

g. *Homicide Investigator Phil Ricciardi*

Riverside County Sheriff's Homicide Investigator Phil Ricciardi traveled to the Riverside Community Hospital the day after the murders to interview Conya L. Investigator Ricciardi first presented Conya L. with a picture of Walker, whom Conya L. had previously identified to the police by way of his moniker. Conya L. began crying and said "he was the one that did this to her."

Investigator Ricciardi then read Conya L. a photographic lineup admonition and presented her with a lineup containing a picture of defendant. Conya L. pointed to defendant's picture and said "he was the one that was cutting on her throat." At trial, Conya L. provided an in-court identification of defendant, stating: "I'm a hundred percent positive . . . . There is no doubt in my mind . . . . It was Rob. We were in the bathroom with the light on."

In August 1995, Conya L. was visited by Riverside County Sheriff's Detective Gary Thompson. Detective Thompson presented Conya L. with a photographic lineup for the purposes of identifying the third perpetrator. Conya L. identified a man named Shawn Ford, but it was later discovered that Shawn Ford had been incarcerated on July 15, 1995, and could not have been the third perpetrator.

h. *Detective Martin Wildeman*

Las Vegas homicide detective Martin Wildeman testified that after the murders, the Las Vegas Metropolitan Police Department began conducting surveillance at a motel where defendant was suspected to be staying. On July 26, 1995, defendant was seen leaving his motel room wearing a wig and hat. After defendant returned to his room, law enforcement officers surrounded the motel and took him into custody. Upon being arrested, defendant spontaneously declared: "I guess I'm fucked because I'm going to jail behind two murders." Defendant refused to provide his name but said to another officer: "I'm hiding out

7

because they're looking to pin a homicide on me." A loaded gun was found in the nightstand of the hotel room. At trial, Conya L. testified that she was "positive" the gun was the same gun that Walker had pointed at her during the attack.

2. Defense Case

The defense called several witnesses to the stand. First, Sonya Jimmons testified that she was working as a social worker at the Riverside Community Hospital when Conya L. was admitted in July 1995. Jimmons testified that Conya L. reported to her that she had been sodomized during her attacks and that her co-victims had each been shot in the head by their attackers. Jimmons also stated that Conya L. had a visitor when Jimmons was present and that Conya L. was laughing and joking. She further testified that Conya L. had requested a pregnancy test.

Second, the defense called Riverside County Sheriff's Deputy Don Plata. Deputy Plata testified that he had participated in the investigation of the murder scene on July 15 and 16, 1995. He spoke with neighbor Michelle Contreras, who informed him that she had seen four cars leaving Gary's house.

Third, the defense recalled Conya L. and established that she had been convicted of misdemeanor welfare fraud in 1991. Conya L. subsequently lied about that conviction on two employment applications submitted in 1992 and 1996. Conya L. signed the 1992 application under penalty of perjury. In 1994, Conya L. fraudulently used a Medi-Cal card.

The defense also attempted to impeach the credibility of Conya L. and Scott through cross-examination. With respect to Conya L., for example, the defense noted that two days after the murders Conya L. had said in a taped interview that only two men had exited the car and approached the house, while at trial she claimed there were three men. Conya L. had also said in a taped interview three weeks after the murders that defendant was five feet seven inches

8

tall and weighed 170 pounds. Defendant was almost six feet tall and weighed 275 pounds at the time of the murders.

With respect to Scott, the defense suggested that Scott had attempted to obtain a reduction of his prison sentence in exchange for testifying against defendant. In a letter dated June 5, 2002, for example, Scott had written: "I was willing to assist you [prosecutors] in the past, and I was under the impression your office back then was going to assist me with the US Attorney and judge in the [Lake Forest robbery] case."

## B. Penalty Phase

### 1. Evidence in Aggravation

The parties stipulated that defendant had been convicted of three prior felonies. The first conviction was for possession of cocaine in 1986, and the others were for possession of a firearm by a convicted felon in 1992.

Roscoe's brother, George Frank, testified that Roscoe was 55 years old when he was murdered. Frank testified that Roscoe was caring, funny, morally decent, and well-liked. Frank said that the family missed Roscoe terribly and that Frank's grandchildren were aware that Roscoe had been tortured and murdered. On cross-examination, Frank acknowledged that Roscoe had struggled with drug addiction and had many criminal convictions for narcotics and theft. Roscoe's sister, Erma Foster, testified that Roscoe had been a good brother and friend, and "was never mean to anybody."

### 2. Defense Mitigation Case

Abel Zaragoza testified that he had worked as a correctional group supervising counselor at the Riverside County Sherriff's Department in 1998. Zaragoza testified that defendant had voluntarily joined and participated in an anger management program while in prison. Daniel Johnson, a teacher who offered general education and other courses to inmates on an independent study

9

basis, testified that defendant had earned his GED and a certificate for anger management class completion.

Defendant's 17-year-old daughter, Fantasia Williams, testified that she wanted her father's life to be spared. Defendant's close friend, Victoria Windom, testified that defendant had been like a son to her and had acted like a big brother to Windom's children. She said that defendant had always been respectful to her and had influenced her children to stay in school. Donna Josey similarly testified that she had known defendant since he was 13 years old and that he had been like a son to her and had made friends with everyone. Defendant had been unable to establish a bond with his father, however, because his father used marijuana and crack cocaine. Josey further testified that defendant had worked at Burger King while he was young and had been a good worker. Pearl Lee testified that she had known defendant since he was young from the "projects" and that defendant had been like a big brother to Lee's daughters and had encouraged them to stay in school.

## II. DISCUSSION

### A. Speedy Trial Claim

#### 1. Procedural Background

Defendant argues that the nearly seven-year delay between his arrest and the start of his trial violated his right to a speedy trial as guaranteed by the Sixth Amendment to the United States Constitution. Addressing this claim requires a somewhat lengthy recitation of the pretrial proceedings in this case.

Defendant was arrested on July 26, 1995, and arraigned on August 11, 1995, along with codefendant Ronald Walker. Defendant was represented at the arraignment by Riverside County Deputy Public Defender Forest Wright. After both defendants entered pleas of not guilty, the preliminary hearing was set for September 7, 1995, before Judge Myers.

10

Following several requests for continuances by both defense counsel and for which both defendants agreed to waive time, a new preliminary hearing date was set for November 15, 1995. On November 9, 1995, Walker's counsel sought a 20-day continuance because he was in another trial. Wright, however, opposed the continuance, explaining that his client "preferred to have the prelim as set." Finding good cause, the trial court continued the matter until December 1, 1995.

On November 29, 1995, Walker's counsel requested another continuance because of a scheduling conflict. Wright withdrew his opposition to the continuance, stating that he had been ill and had been unable to meet with defendant. Defendant agreed to waive time. Prosecutor John Ruiz objected, stating that he was ready to proceed immediately. The trial court overruled the prosecution's objection, accepted defendants' time waivers, and continued the preliminary hearing until December 22, 1995.

During a status conference on December 14, 1995, Walker's counsel requested another continuance. Wright opposed the continuance on behalf of his client. The prosecutor also objected to any further continuances. The trial court denied the continuance request and pushed the preliminary hearing date up one day to December 21, 1995.

On December 21, 1995, Walker's attorney requested another continuance to listen to tapes that had just been provided by the prosecution. Defendant initially refused to waive time, stating: "I don't want to waive no time. I want to come on and do this." He explained: "[T]his case is my life. And I have been in jail five months. And it seems like nothing new has come up in five months." The trial court advised defendant to reconsider: "You can demand your right to go to preliminary hearing. That's fine with the Court. I'm just saying, also realize that your attorneys have indicated they need to review some of this additional information. If that's fine with you and you don't care, . . . because you have

11

knowingly indicated you want to go forth whether your attorneys are prepared or not . . . it is going to preliminary hearing today." Defendant then agreed to waive time. The preliminary hearing was held on January 4, 1996, and both defendants were held to answer. Arraignment was set for January 17, 1996.

On January 17, 1996, defendant requested a *Marsden* hearing to express his dissatisfaction with assigned counsel. (See *People v. Marsden* (1970) 2 Cal.3d 118, 124 [holding that "a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney"].) Defendant explained that he was "not trying to be a problem" but that he felt his case was "getting nowhere." He explained: "My attorney had my case for six months, and it's nothing — it's like we ain't took one step." He requested that he be appointed "an attorney that [was] not so busy." Wright agreed, saying: "He's right. I am too busy. I would like to get rid of a few cases." Nonetheless, he assured the trial court he would be able to provide a competent defense. The trial court denied defendant's *Marsden* motion and set the arraignment for the next day.

On January 18, 1996, both defendants were arraigned on the information, and the district attorney gave notice that the death penalty would be sought. Counsel for both defendants sought to continue the trial date beyond 60 days. Walker agreed to waive time, but defendant refused. Walker's counsel then moved to sever the cases, stating: "We cannot be ready within 60 days, and if Mr. Williams forces us to be going to trial within 60 days, I think my client would be severely prejudiced . . . ." The severance motion was continued, and the continuance motion was denied. The trial was set for March 11, 1996.

On February 2, 1996, Walker's counsel filed a motion to sever his case from defendant's because he needed more time to prepare for trial and because

12

defendant was refusing to waive time. At the next hearing on February 23, 1996, Wright joined in the motion to sever. The motion was denied. The trial court denied defendant's second *Marsden* motion on that same date.

On March 1, 1996, Wright requested a continuance of the trial date over defendant's objection. The court asked the defendant: "I take it you want to continue to object to a trial date beyond that March 11 date; is that correct?" Defendant replied: "Yes." Despite defendant's objection, the court found good cause to continue the trial another 60 days to May 6, 1996. Shortly thereafter, the case was reassigned to Judge McConaghy.

On May 3, 1996, counsel for both defendants moved to continue the trial date. Wright indicated he would be unprepared to proceed with the trial as scheduled. The prosecutor announced that the prosecution was ready for trial. Defendant again expressed frustration with the lack of progress in his case and said he had not spoken with his attorney a single time since the last hearing. The trial court then held another *Marsden* hearing, at which point Wright acknowledged that his being "in court every day, all day" was impeding his ability to work on motions. He indicated, however, that he was proceeding "as diligently as [he could] at this point, given the staff level that [he had] among qualified persons." The trial court denied defendant's *Marsden* motion and continued the trial to October 7, 1996. The trial court explained: "And I do this, that is, grant the 1050 motion [for a continuance] reluctantly because I know [defendant] wants a speedy trial. And, as I previously said, that the Court would like to get this trial . . . starting Monday morning. I would be more than happy to do it, but we do have conflicting constitutional issues involved . . . . [¶] And as I previously stated, the constitutional right to have a competent attorney, in this Court's opinion, far outweighs the constitutional right to a speedy trial, which does not mean that we totally ignore the right to a speedy trial."

On August 30, 1996, the trial court considered defendant's fourth *Marsden* motion. Defendant again voiced his concern over his attorney's lack of progress in preparing for trial: "I would like to see if it's possible to relieve my counsel and represent myself in this case, because I don't feel that I'm going to get a fair trial . . . . [E]verything that [defense counsel] stipulated that he needed the extra 60 days for [at the last hearing], . . . still none of them was completed." He then clarified: "If I can have a new lawyer appointed, then I know there's no way in the world I would try to fight a case like this myself. But if I cannot have a new lawyer appointed, that is my desire to represent myself." Wright responded that defendant had been "a little bit stingy with his information at times," and that "it's not the case that nothing's been done, because a lot has been done in this matter." He added that the investigation was ongoing, but noted that defendant's "life has been very different from a lot of persons' background, and that's created problems in finding relatives and finding a lot of things that are necessary." During further closed hearings held on September 4, 1996, and September 11, 1996, defendant withdrew his request to represent himself, and the trial court indicated that it "fully intend[ed] to start this trial on October 7th."

At a separate hearing on September 4, 1996, the prosecutor announced he was ready for trial but "indicate[d] for the record that [he had] received no reports from either of the defendants relating to reciprocal discovery." On September 11, 1996, Wright said he did not anticipate being prepared for the trial and requested second counsel or "*Keenan* counsel." (See *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 [trial court has discretion under statutes governing appointment of counsel to appoint a second defense attorney to assist in defense of a capital case]; § 987, subd. (d).) At the end of the hearing, the trial court asked defendant if he would be willing to "waive [his] right to a speedy trial until October 7th, plus 60

14

days thereafter . . . ?" Defendant agreed. On September 20, 1996, the trial court denied Wright's request for *Keenan* counsel.

On September 23, 1996, defendant filed a petition for writ of habeas corpus in the Riverside County Superior Court asserting ineffective assistance of counsel. The petition was denied.

On September 27, 1996, defense counsel for both defendants moved to continue the trial until January 27, 1997. In a written declaration, Wright said he had "not completed investigation of the 'guilt/innocence phase' of the case." He explained that his "on-going duties to represent other clients . . . necessitate[d] [his] diligent attention to nine felony cases . . . . set for jury trial before the end of November, 1996, and also to one other death penalty case." During the hearing, Wright said that he believed that a second attorney should be assigned to the case and that he would be "in much better shape" if his office could make that accommodation. Asked if he would be willing to waive time, defendant responded: "I'll go ahead and waive time. It won't make any difference, but I'll go ahead and waive time." He requested the trial court's assurance, however, that the new trial date would be fixed and firm: "I'd just like to know that after the continuance, the January 27, ten days after that, after that is you going to continue this again, or is this it?" The trial court responded that its "impression of what we're doing is that we're picking a firm trial date with a time waiver until that date, plus ten court days thereafter, with one little exception. If there's some reason why either of the defense attorneys need a . . . short continuance after that, to provide all the rights you two fellows have a right to."

On November 15, 1996, the trial court instructed Wright to provide the prosecution with a list of all unresolved discovery issues by December 13, 1996. After receiving the list, the prosecution indicated that it intended to contest several of defendant's discovery requests. The trial court scheduled a hearing on the

15

contemplated discovery motions for January 3, 1997. This date was later continued to January 15, 1997.

On January 15, 1997, defendant was represented by Wright's associate, Deputy Public Defender Mara Feiger, who had agreed to serve as cocounsel. Feiger, along with Walker's attorney, requested a continuance of the January 27, 1997 trial date. The trial court granted the request, and trial was continued to April 28, 1997. Feiger indicated that she expected the new trial date to be firm. Asked to waive time, defendant said he did not believe it would assist him to refuse to waive time because the matter would be continued over his objection: "[T]he way it sounds, it don't really make a difference if I agree or not. It seems like everybody else agrees to it. I mean, me saying no ain't helping me other times. I don't see how it's going to help me now. . . . [¶] I mean, it don't help me none to sit here and say, no, I don't waive my time, because the thing's going to be continued." The trial court accepted defendant's comments as a valid waiver and continued the trial to April 28, 1997.

The trial court held various hearings on discovery-related matters in February and March of 1997. On March 7, 1997, the prosecutor requested that the court redact Conya L.'s address and phone number from certain documents before they were turned over to the defense. The trial court ordered the parties to brief the issue. On March 21, 1997, Feiger indicated that she anticipated requesting a continuance because she wanted to bring a motion to compel numerous discovery items.

On March 24, 1997, the trial court held a fifth *Marsden* motion hearing. At the beginning of the hearing, defendant stated that he "[didn't] know if this was the proper way to address what I wanted to address," and explained that he simply wanted to speak to the court. He first attempted to apologize for his behavior, but the trial court responded: "I'm not worried about your behavior." Defendant then

16

stated: "I just wanted to say this. You have been basically familiar with my attempts over and over trying to relieve Mr. Wright of counsel, and my not waiving time, trying to hurry up and rush the trial. The reason that I was doing that was because I felt that this was just going to get against — pushed to trial. And the outcome is already set. . . . Now, since Ms. Feiger has been on my case, a lot of the things that we got continuances for a year ago just now started getting done; a lot of the investigation, a lot of — just basically preparing for my defense just started getting done since she's been my attorney. . . . Now, I see the work that my attorney is doing, and I also know, just like I knew then, that I am facing death in this case. So I just want, if possible, to give her whatever time she can get, or what she would need." When asked if he wanted to relieve his two lawyers, defendant responded: "I don't want to fire Ms. Feiger. If I can fire Mr. Wright, I would love to. But I failed on, I think, four different times so I kind of gave up on that."

On March 31, 1997, Feiger filed a motion to compel the prosecution to produce Conya L.'s address and requested a continuance. Also on that date, the prosecution indicated that it was in possession of taped jailhouse conversations between Walker and his girlfriend to which defendants were entitled. Defendant waived time, and the trial court continued the trial to July 28, 1997.

On April 29, 1997, the prosecution indicated that it had turned over to the defense the recorded conversation between Walker and his girlfriend, but that it had not yet provided a transcript of the girlfriend's statement to the police. Also on that date, the parties revisited the question of whether the defense was entitled to disclosure of Conya L.'s address and telephone number. After several more hearings on this question, the trial court ruled on June 6, 1997, that it would not order the requested information disclosed to the defense. Also on June 6, 1997, counsel for both defendants moved to continue the trial in light of the ongoing

17

discovery disputes. Defendant waived time, and the trial date was continued to October 10, 1997.

On August 7, 1997, the parties continued litigating various discovery issues, including defense counsel's request for the address of another witness. The trial court ordered the prosecution to produce the address. The prosecution was granted a two-week continuance to consider taking a writ to challenge the ruling. When no writ was filed, the trial court granted the prosecution an additional 15 days to respond to the court-ordered disclosure.

On September 5, 1997, Walker's counsel declared a conflict and sought to be relieved. The motion was granted two weeks later, and an attorney from the criminal defense panel (CDP) was appointed to represent Walker. The trial court heard multiple defense discovery motions on September 29, 1997.

On October 7, 1997, Feiger said she probably would not be prepared to go to trial for at least a year because she believed that the prosecution had failed to adhere to its discovery obligations. Walker's new counsel similarly indicated that he would not be prepared for trial for at least six months and "probably closer to . . . 12 than six." The prosecution objected to any continuance and claimed that the defense "was engaged in a fishing expedition." The prosecution also argued that the trial court had "an obligation to appoint counsel, where counsel on the case can proceed in a fashion that would not disrupt the orderly administration of justice," and that it was not appropriate for the court to grant a year-long continuance "just so CDP can keep it in-house." The trial court acknowledged that "discovery ha[d] not been smooth in this case in either direction" but said it was not "pointing a finger" at either the defense or the prosecution. The trial court ultimately granted the motion to continue and set a "firm" trial date for August 3, 1998. Defendant agreed to waive time.

18

On December 5, 1997, the prosecution requested an additional two weeks to respond to a defense motion to compel disclosure of witness information. The request was granted.

On January 23, 1998, Feiger said the prosecution still had not turned over the discovery items the trial court had ordered produced on September 29, 1997. The prosecution addressed each item in turn and agreed to provide the missing items. The parties dispute whether or not the relevant materials had been provided in a timely fashion.

On April 3, 1998, the public defender's office declared a conflict with defendant. A representative of the public defender's office, Floyd Zagorsky, said that while he was not at liberty to discuss the nature of the conflict, it was "a result . . . of information that we received recently from the prosecution . . . we felt should have been provided much earlier in the case." In response, the trial court relieved Wright and Feiger. Because of the conflict, defendant's case was referred to the criminal defense panel, and CDP attorney Jay Grossman sought and received a 31-day continuance to arrange for another lawyer to represent defendant. A month later, on May 4, 1998, Grossman was granted a 27-day continuance as he continued to arrange for defendant's representation.

On June 2, 1998, CDP attorney Grover Porter was appointed to represent defendant. Porter requested that the trial be scheduled for February 23, 1999, so that he could have adequate time to prepare. Defendant agreed to waive time.

On September 18, 1998, Porter asked to withdraw for health reasons. The trial court granted the motion. On September 25, 1998, CDP attorney Douglas Myers was appointed as counsel. On October 1, 1998, Myers appeared and indicated that CDP attorney John Aquilina would be his cocounsel; the hearing was continued until October 20, 1998 to determine how long defense counsel would need to prepare for trial. On October 20, 1998, Myers was relieved, and

19

Aquilina said he needed an additional two weeks to evaluate the file in order to determine when he could be ready for trial. On November 3, 1998, stating that he had recently received "eight boxes of materials," Aquilina requested that the trial date be pushed back seven months. The trial court found good cause to continue the trial to June 14, 1999.

On January 22, 1999, Aquilina indicated that another death penalty case was "[o]ccupying a great deal of [his] time" but that he still anticipated being ready for trial on June 14, 1999.

On April 23, 1999, Aquilina requested that the trial date be continued in order for him to conduct additional investigation and because of an issue regarding his investigator that he could only discuss in camera. The prosecutor opposed the request, highlighting the age of the case and pointing out that defendant's investigator had been involved with the case "for years." The trial court agreed that defendant's case was then "the oldest one in the courthouse" but agreed to hold an in camera hearing to discuss Aquilina's concerns.

During the in camera hearing, Aquilina informed the trial court that Grover Porter had retained an investigator in June 1998 but that neither Porter nor Aquilina had asked him to "conduct any investigation whatsoever." About three weeks prior to the in camera hearing, the investigator had informed Aquilina that he needed to withdraw from the case to care for a terminally ill family member. As to retaining a new investigator for the guilt case, Aquilina believed that one would be available in June. A paralegal who had worked for Wright on the penalty phase would also be available after her final exams were completed in June. Summing up the situation, Aquilina said "no investigation [to] my knowledge has been conducted since the public defender's office was relieved in April of '98."

At the hearing, Aquilina further commented: "I guess what distresses me the most is that the public defender was appointed to Mr. Williams' matter, it appears, on August the 11th of 1995, was relieved in April of 1998, after declaring a conflict of interest. And . . . it would appear all an attorney would have to do is catch up to what has occurred. Quite candidly, I don't see that even five percent of the investigation necessary in the guilt phase of this case has been conducted." Aquilina noted that various witnesses had not been interviewed and that "trying to locate witnesses, contact witnesses, interview witnesses" going forward would "obviously not [be] as easy as it would have been back then." Aquilina apologized to the court that during his own representation of defendant since October 1998, he had not moved the investigation forward because his engagement on two other death penalty matters had prevented him from working on defendant's case. Aquilina said he didn't think that "mentally, emotionally, psychologically" he could handle "three capital cases in one year in a twelve-month period." Toward the end of the hearing, the court said to defendant: "I've held a few Marsden motions with you and a few motions that weren't truly Marsden motions, but when we got to talk about what's going on — and I think it's safe to say it's been your concern all along that not enough has been done in your case."

On May 13, 1999, Aquilina requested that the trial date be continued. The prosecutor opposed the request. Walker also opposed the continuance request. Defendant waived time, and the trial court continued the trial until January 10, 2000. Four days later, on May 17, 1999, the trial court held a sixth *Marsden* hearing. Defendant indicated that he had been unable to communicate with Aquilina or his staff, and voiced his concern about Aquilina's apparent failure to make any progress on the case. Defendant also expressed his fear of going to trial "with an attorney that only knows bits and pieces of the case." Aquilina

21

acknowledged that defendant was "partly correct" in that he "[had] not been able to give [defendant's] case or [defendant] the attention he needs or deserves." Aquilina represented, however, that he would be prepared to start the trial in January 2000. Defendant's *Marsden* motion was denied, and on June 25, 1999, CDP attorney Regina Filippone joined Aquilina as cocounsel for defendant.

On August 30, 1999, the trial court held a seventh *Marsden* hearing. During the hearing, the presiding judge left the courtroom, and Aquilina disclosed to a different judge that one of his other clients might have information that could impeach Conya L.'s testimony in defendant's case. In light of this potential conflict of interest, defendant's *Marsden* motion was granted. On September 2, 1999, CDP attorney David Gunn was appointed to represent defendant.

On October 1, 1999, Gunn said he needed several weeks to determine when he could be ready for trial and also said he was in the process of securing cocounsel. On October 22, 1999, Gunn indicated that the January 10, 2000 trial date was unrealistic and that he was still in the process of securing cocounsel.

On November 22, 1999, Gunn explained to the trial court that he was still attempting to secure cocounsel and would not be prepared for trial in January. Noting Walker's objection to any further continuances and "recognizing that this is going to take two juries," the prosecutor said he was "prepared to make a motion to sever the two cases." On December 17, 1999, the trial court granted the severance motion, stating: "[I]n fact, I wish we would of thought of this at least a couple of years ago. But we didn't. Or at least we didn't talk about it. It seems like it might be the only way we're ever going to get this case to trial is to sever it and bite the bullet and actually do the case twice." Also on that day, Gunn announced that CDP attorney Bruce Cormicle would be serving as cocounsel.

On December 21, 1999, the trial court heard defendant's eighth *Marsden* motion. Defendant indicated that he wanted to bring to the trial court's attention

22

the fact that he was having difficulty communicating with Gunn "before we get too far down the line." He also stated: "I'm tired. I want to go to trial. I'm tired of sitting here. As you recall, two years ago, three years ago, I didn't want to waive no time. I wanted to go to trial then. I look at — like, you understand, my life is on the line. If I was going to lose my life, let me lose it now and not sit in here for four, five years, which looks like I ended up doing anyway. In the last two years, nothing's been done." The trial court denied the motion.

Also on December 21, 1999, following the *Marsden* hearing, Gunn informed the trial court that he had "about eight murder cases still set pending for next year" and that he would therefore request a trial date of October 2, 2000. The trial court granted the request.

On January 14, 2000, CDP attorney Cormicle officially appeared as cocounsel for defendant. During an April 7, 2000 status conference, the trial court inquired if the parties would be prepared to go forward with the October 2, 2000 trial date. Gunn said that the defense was "on track" but that he had "lost [his] investigator due to family problems" and that he was just in the process of getting new investigators "on board." On May 12, 2000, Gunn indicated that his effort to retain an investigator had been unsuccessful and that the problem would likely affect his ability to be prepared for the upcoming trial date.

On June 9, 2000, the trial court held a ninth *Marsden* hearing. The trial court concluded the hearing when defendant acknowledged that he did not want to "fire[]" his attorney and simply wanted to apprise the court of the status of his case. The same day, Gunn informed the trial court that he had just gotten funding approved for an investigator and that before the funds were approved, he had experienced "a period of time of about two months where we kind of lost our ability to have investigative work done."

23

On July 14, 2000, the trial court heard defendant's tenth *Marsden* motion. Defendant voiced his concerns as follows: "I would like counsel dismissed on my case, due to the fact that from day one . . . to the present date, me and counsel does not have no opportunity to sit down, and he actually know anything in this case. Ask him about the case. Time and time again he told me that he would get caught up with the case. That's all been a lie. We referred to the Court four months ago we didn't have an investigator. We got an investigator three months ago. To the present date, no investigator has been to talk or — the case been at a stand still for 10 months since Dave Gunn been on the case." In response, Gunn acknowledged that because of his problems finding an investigator and obtaining the requisite funding, he had lost "three to four months, in terms of actual preparation of the investigation." He also acknowledged that the investigator had not met with defendant since funding had been approved because of "vacations" and that the investigator had been "working on a death penalty case in Rancho Cucamonga that was just concluded."

After hearing both sides, the trial court issued the following ruling: "I'm going to deny the motion. . . . The bottom line, as I see it . . . is to have adequate representation and be prepared for trial is a must. Whether or not that gets done on a full-time basis working from sun up to sundown for a short period of time, or anything in between that, and working an hour all day for 10 years I don't think is what's important. [¶] What's important is, is there adequate representation at the time we get started at trial? And so I can't even pretend that I know enough or that I have the power or authority to tell Mr. Gunn you must work ex number of hours this week on this case, because he has to manage his calendar. He's got other clients he is also working for. . . . [¶] I understand from your stand point, Mr. Williams, that you're the person that's on the line here. You have been — this is an old case in many respects. This case should have been to trial a good long time

24

ago. No one is going to quibble about that. If we would have bifurcated a good long time ago, perhaps we would have had part of it to trial already and had been done. Didn't do so. That's neither here nor there. That's just a fact of life. [¶] I see no reason why this one won't get to trial in a timely manner now. And I'm just — I don't see any reason to grant the motion."

On August 11, 2000, defendant moved to represent himself. (See *Faretta v. California* (1975) 422 U.S. 806, 819 (*Faretta*).) On August 16, 2000, the trial court granted defendant's *Faretta* motion, but directed Gunn to remain as "standby counsel." At defendant's request, the trial court continued the trial date to February 5, 2001.

At a hearing held on October 6, 2000, defendant voiced concerns regarding Gunn's role as standby counsel. Defendant further noted that he had filed a malpractice suit against Gunn and said he did not "know if that would declare a conflict or not." Defendant also claimed that his court-appointed investigator would not take his calls and failed to visit him in jail.

On October 13, 2000, the trial court considered defendant's motion to compel disclosure of various discovery items. The trial court indicated that it would "handle that [motion] like I would any other discovery motion" and "order that . . . the defendant and the district attorney [] get together and narrow the list down to items that one side still thinks they have a right to." The trial court also informed defendant that it had no role to play in defendant's request for funds.

On November 3, 2000, attorney John Davis filled in for prosecutor John Ruiz and requested that the hearing on defendant's discovery motions be postponed until Ruiz's return. Davis noted that Ruiz "would . . . be the person to argue on [defendant's] current motion, which appears to be a discovery motion for six or eight . . . audio tapes and 911 logs . . . that normally we don't object to, but we probably have not provided to him previously. And they probably should have

25

been." The trial court continued the hearing until November 9, 2000. On November 9, 2000, Ruiz was "still ill," and the trial court again postponed the hearing.

On November 22, 2000, Davis informed the trial court that Ruiz would likely "be ill for probably another three or four weeks." Defendant stated for the record: "[I]t seems like it's getting impossible to get investigation and discovery issues. And I just hope it don't be difficult when that time come to go to the next phase, as far as you understand having to fight for a continuance and not look like it's my reason why I need the continuance." The hearing was continued until January 4, 2001.

On January 4, 2001, Ruiz was still ill. The trial court expressed its concern with Ruiz's continued absence and suggested that Davis be prepared to take over the case: "I'm a little bit concerned that we're — Ruiz can try this case easily enough because he tried [Walker's] companion case earlier. . . . But we don't know what his health is. . . . I don't want Davis to think I'm trying to run the DA's office, but Davis can try this case. . . . Davis is a good enough lawyer. He's got enough time that he can be ready. . . . [Ruiz is] the best candidate to try it because he's tried the other half of it, but I don't want to get into a position where [defendant] is caught between a rock and a hard spot because the DA's office is not ready." The hearing was continued until January 12, 2001.

Ruiz returned for a hearing on January 12, 2001. During the hearing, defendant claimed that the prosecutor had failed to provide him with discovery; the prosecutor, in turn, responded that some of the requested items had been turned over to the defense long before. The trial court ordered the parties back on January 26, 2001, to consider a new trial date. The trial court also denied defendant's request that the trial court "appoint a second counsel."

26

On January 26, 2001, defendant filed a motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.1. On the same day, the prosecutor informed the court that his office had made copies of several of the tapes defendant had requested but that "[defendant] doesn't get these until they are paid for." Defendant responded that he had no investigator and that he didn't know if funding had been approved. On January 30, 2001, the trial court denied defendant's section 170.1 motion.

On January 31, 2001, defendant stated that he needed a six-month continuance, explaining that he was "starting from scratch" and needed time to prepare. The prosecutor objected to further delay, represented the prosecution was ready to proceed to trial immediately, and complained that defendant was utilizing his in propria persona status to cause delay. The trial court granted defendant a two-month continuance until April 2, 2001.

On February 23, 2001, the prosecutor told the trial court that he had given his investigator's phone number to defendant. Defendant responded that the investigator never picked up the phone to accept his collect calls. Also on February 23, 2001, defendant filed another motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.1. The motion was denied.

On March 7, 2001, defendant filed a motion to disqualify the prosecutor pursuant to Penal Code section 1424, another motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.1, and a motion for a change of venue pursuant to Penal Code section 1033. The motions were all denied. On March 16, 2001, defendant waived time, and his motion for a continuance was granted over the prosecutor's objection. The trial was continued until June 4, 2001.

On March 20, 2001, defendant claimed that tests had been performed on his clothing but that the results had never been produced; the trial court put the matter

27

over at the prosecutor's request. On April 5, 2001, Ruiz turned over the clothing and test results, which revealed that no blood had been found on the clothing. Also on that date, defendant indicated that some of the tapes the prosecution had provided contained no audio; Ruiz responded by promising to have copies made and to turn them over to defendant once they were paid for. The trial court also granted defendant's request that his wife, Sharon Williams, be appointed as his unpaid legal runner.

On April 17, 2001, the prosecutor told the court that defendant had been provided additional copies of discovery that he did not believe to be in his files, and said defendant had refused to reimburse the district attorney's office for the cost of photocopying the requested documents.

On May 1, 2001, standby counsel Gunn indicated that standby cocounsel Cormicle would be unavailable in June and therefore requested that the trial date be pushed back into July 2001. The court stated that the reason it "appointed standby counsel [was] because [it believed] there [was] a better than even chance [standby counsel would] end up trying the case" and that it would therefore be prudent to allow standby counsel adequate time to prepare in case they were called upon to take over the defense. Defendant said he did not oppose the request and waived time. Over the prosecutor's objection, the trial court continued the trial until July 30, 2001. On May 18, 2001, the trial court denied defendant's motion to remove Gunn as standby counsel.

During a June 15, 2001, trial readiness conference, the trial court noted that it had received a letter from defendant's court-appointed investigator notifying the court that the investigator was "no longer" on the case and asking for his appointment to be terminated. In the letter, the investigator stated: "I find it impossible to work with Mr. Williams." The trial court granted the investigator's request and relieved him from the case.

28

On June 28, 2001, the trial court heard defendant's motion to remove Gunn as standby counsel. Citing the civil litigation he had filed against Gunn, defendant argued that Gunn would not do his "best" because a guilty verdict would provide Gunn with a defense to defendant's pending civil suit. Gunn indicated that he was "concerned enough" about the potential conflict that he had "called the State Bar," but stated that he still believed he could serve as standby counsel. The court denied the motion.

Also on June 28, 2001, the prosecutor argued that defendant was engaged in delay tactics. The prosecutor stated: "The court knows how long I have sat back and waited. But . . . the letter by Mr. Evans [defendant's investigator] — you know, thank God a non lawyer addressed this court because this non lawyer told you in no uncertain terms what the problem is. And that's symbolic of what the problem has continued to be. As he states in his letter, he asked to be relieved from his position, appointed as his investigator, quote, 'I find it impossible to work with Mr. Williams.' This letter lays out how Mr. Williams has done everything to delay the proceedings in his dealings with the investigator. He takes a hostile attitude with his own investigator and refuses to cooperate with him."

The trial court noted at this point that defendant had chosen and hired this investigator himself. The prosecutor agreed and added: "The record has shown that this defendant has tried to fire every lawyer he has ever had." When defendant interrupted by saying, "Not Mara Feiger," the prosecutor said that "the only reason he did not try to fire Mara Feiger is because he saw in Mara Feiger a lawyer who was going to tell him to violate Court orders that you just laid down in the courtroom in that very session. . . . This is only going to delay the proceedings and stretch it out. So the only attorney he never tried to fire was Ms. Feiger. And she did him the favor, after representing him for a year and a half, of declaring a conflict of interest, knowing that that was going to delay the trial another year,

29

playing right into the defendant's hands.  So no wonder he wants to put her up on an alter [*sic*].  She did his bidding.

"What do we see here in the letter?  We see a non lawyer addressing the Court letting us know what's going on with Mr. Williams.

"He tried to fire Forest Wright so many times I can't count them.  Then he was given Grover Porter.  Mr. Porter's health did not allow him to take the aggravation that we now see that Mr. Williams dishes out to the people that are forced unfortunately to deal with him.  He fired — or he Marsden'd John Aquilina.  [¶] Your honor has done so many Marsden motions on Mr. Gunn as counsel, I think it says something.  When you look back — this is a conservative estimate — he's made 25 Marsden motions.  Now, at some point the world says, 'Is it us or is it him?'  And it's him."

The prosecutor then urged the trial court to relieve defendant of his *Faretta* status:  "Your Honor has the basis today for relieving the defendant of his pro per status by finding that the defendant has used and manipulated his pro per status to delay these proceedings.  Because if the Court enjoys discretion in anything, it is to effect the orderly administration of justice in this courtroom.

"Your Honor, Mr. Williams — I want to add to that how long we've been on this case.  We arrested Mr. Williams two weeks after the murders on July 15th of 1995.  In two weeks, we'll celebrate the sixth anniversary of the murders in this case.  And he has done everything he can to stretch it out, to delay it, to avoid this day, in the hopes that Conya dies, that the other witnesses are unavailable.  There has been evidence of the defendant's attempts to have Conya killed from years ago.

"Your Honor, I think the appellate courts are going to say, 'Mr. Williams, six years is long enough.'  He is no closer to trial today than he was a year ago. He doesn't even have an investigator.  No investigator will work with him.  How

30

is he going to serve subpoenas? . . . No subpoenas served. I haven't seen one witness list from him. I've got no discovery from him. [¶] Judge, enough is enough. Please grant the motion."

When asked if he wished to be heard, defendant explained that he had had a dispute with his investigator over funding, and that the reason he liked Mara Feiger but not his other attorneys was that she was the only attorney who had made progress on his case. He then stated: "I — at this point, I'm kind of, like, fed up. Whatever y'all want to do. . . . This is your house. I'm burnt out. [¶] But the — I will say this here. You give this man the case. The man don't know nothing about the case. . . . If I have the case, I'm not asking for no continuance. I'm not asking for . . . you to put it off. As far as our trial date stands now, I am ready to go to trial. . . . I know my case. I feel I know my case better than any other attorney to have my case besides Mara Feiger. I feel the only reason I want to fight my case — I know I'm in over my head, but the only reason I want to fight my case, because I don't want to go to trial with somebody like Mr. Gunn that don't have no knowledge of the case, and go through arguments like this. . . . So if you want to take my pro per status, fine. This is your courtroom. Do what you want to do. I don't care. But don't give it to this man. That's the whole thing I've been fighting. That is why I filed the motion to remove him as standby counsel, because when he was counsel he ain't doing nothing."

When asked by the trial court if he had retained a new investigator, defendant stated: "No. I do plan on, yes." The trial court then made the following findings: "that Mr. Williams has had — and I do not know the number of Marsden motions. I can't even count the number of lawyers that he's had. And I agree with him, the only one he liked was Ms. Feiger. And I think it was probably for the reason, as Mr. Ruiz said, because she was — as a trial attorney, she was a hand-holder for defendants. And that's what Mr. Williams has been

31

looking for all along, somebody that will come through here anytime he wants to be seen. [¶] I find that I agree with Mr. Williams, he's in over his head. And that all of these have been delay tactics. And I'm going to remove him from his pro per status. And Mr. Gunn has become the lead attorney."

On July 30, 2001, the date set for trial, Gunn represented to the trial court that the defense required an additional 30-day continuance because he needed more time to prepare for trial. When asked if he would agree to a continuance, defendant stated: "I don't agree to nothing." Finding that there was a "15-court day waiver beyond today's date," the trial court continued the matter to August 10, 2001. On August 10, 2001, the trial court found good cause to continue the matter until August 20, 2001.

On August 20, 2001, Gunn declared a conflict because of the pending lawsuit filed by defendant. Gunn also cited communication problems and defendant's failure to cooperate with defense preparations. The trial court said: "[I]t's another way of him delaying this trial by suing you. [¶] Next thing, Mr. Cormicle is going to be sued for malpractice. Where does it end?" But Gunn informed the court that "Mr. Williams does cooperate with Mr. Cormicle" and "[w]ill communicate with him, cooperate in his defense," and that the breakdown appeared specific to the relationship between defendant and Gunn. The trial court therefore relieved Gunn and appointed Cormicle as lead counsel. Finding good cause, and without a time waiver from defendant, the trial court granted Cormicle's request to continue the trial date and set a trial readiness conference for September 20, 2001. On September 20, 2001, Cormicle requested a continuance because he was having difficulties securing investigative funds on behalf of the defense. Defendant refused to waive time. Finding good cause for a continuance, the trial court continued the trial to March 4, 2002.

32

During a January 23, 2002, trial readiness conference, Cormicle requested a trial continuance because he had yet to receive some federal documents that he had subpoenaed regarding bank robberies committed by victim Gary Williams. Defendant waived time, and the trial was continued to April 8, 2002.

A hearing set for March 8, 2002, was postponed for a week at the request of the prosecutor. On March 15, 2002, the prosecutor requested an additional two-week continuance to give him "time to finish [another] jury trial." The trial court granted the request.

On March 29, 2002, the trial court heard and denied defendant's eleventh *Marsden* motion. The trial court told defendant that "[p]art of the reason this case is old" is that "[w]hen the case gets ready for trial and gets near the time for trial, we fire a lawyer or we represent ourselves . . . ." Later that same day, Cormicle requested a continuance of the trial date. Cormicle said that the FBI had granted him access to its files four days earlier regarding 15 separate bank robberies committed by Gary and his associates, and that he needed more time to review these materials. Defendant waived time, and the trial court continued the matter until June 10, 2002.

On April 23, 2002, Cormicle represented to the trial court that he was "still receiving additional reports, significant reports, that should have been turned over seven years ago but were not." Specifically, Cormicle indicated that he had only recently received "a four-page report from the FBI that was in the possession of the district attorney pertaining to Robert Scott." According to Cormicle, the report contained statements that were inconsistent with Scott's prior statements and identified witnesses that had not previously been identified. In response, the prosecutor claimed that "[t]he problem with why that was not turned over earlier is because of the revolving door of defense attorneys" who failed to "follow through" with discovery. He also claimed that the new material was

33

"independently obtainable by defense counsel." Cormicle responded that the prosecution had an obligation to turn over the material under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and that "there had been a demand for reports from my client during the time that he was pro per."

During an ex parte hearing held on April 25, 2002, Cormicle represented that he had "basically started from scratch" because "nothing had been done for the past six years . . . ." He also said he had recently come across a one-page document titled "Gary and 100 bandits" that "was an outline of . . . 15, 16, or 17 bank robberies that Gary Williams was believed to have orchestrated and organized." The defense had only recently received about "700 pages" of information regarding these prior bank robberies and the associates of Gary Williams who may have had reason to rob or kill him. Cormicle also clarified that the four-page document he had referred to two days earlier was a "proffered statement" from Robert Scott "where he's presumably looking to cut a deal with the US Attorney."

On May 1, 2002, Cormicle requested that trial be continued until August 2002 in order to give him time to explore issues regarding third-party liability and complete his investigation. At the request of the prosecutor, Conya L. addressed the trial court and explained that she felt threatened and wanted to "get this out of the way." The prosecutor urged the court to reject any further requests for delay and argued that defendant or his counsel had successfully manipulated the pretrial process over the past six years. The prosecutor asked the court to consider "the length to which Mr. Williams will go to thwart your will and break your will, that this case ever get to trial." The court responded: "Mr. Ruiz, he's not going to break my will," and "I don't like lawyers insinuating that any defendant's going to control what I do." When the prosecutor pushed back and suggested that the court had not sufficiently challenged the reasons given by defense counsel for seeking

34

continuances over the past six years, the trial court said: "You're wrong. I'm telling you that you're wrong so move on to something else." Noting that the pretrial history of the case read "like a horror story as far as delays," the trial court then continued the trial date to July 1, 2002, over the prosecutor's objection. Defendant agreed to waive time.

The trial court heard and denied defendant's twelfth *Marsden* motion on June 7, 2002. Jury selection began on July 1, 2002.

2.      Analysis

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." "[T]he right to a speedy trial is 'fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." (*Barker v. Wingo* (1972) 407 U.S. 514, 515 (*Barker*), quoting *Klopfer v. North Carolina* (1967) 386 U.S. 213, 223.) The speedy trial guarantee "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." (*United States v. Ewell* (1966) 383 U.S. 116, 120.)

In *Barker*, the high court explained that the Sixth Amendment right to a speedy trial "is generically different from any of the other rights enshrined in the Constitution for the protection of the accused" in several important ways. (*Barker*, *supra*, 407 U.S. at p. 519.) First, "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." (*Ibid.*) Lengthy pretrial incarceration "contributes to the overcrowding and generally deplorable state" of local jails, " 'has a destructive effect on human character,' " and imposes significant "cost[s]" on society in the form of maintenance expenses and lost wages. (*Id.* at pp. 520–521.) Second, unlike other

35

constitutional rights afforded the accused, deprivation of the right to a speedy trial "may work to the accused's advantage," as "[d]elay is not an uncommon defense tactic." (*Id.* at p. 521.) "Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself." (*Ibid.*) Third, "the right to speedy trial is a more vague concept than other procedural rights" in that it is impossible to "definitively say how long is too long in a system where justice is supposed to be swift but deliberate." (*Ibid.*) Accordingly, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case . . . ." (*Id.* at p. 522.) Finally, "[t]he amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. . . . Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy." (*Ibid.*, fn. omitted.)

Because "[t]he speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative,' " the high court in *Barker* "refused to 'quantif[y]' the right 'into a specified number of days or months' or to hinge the right on a defendant's explicit request for a speedy trial." (*Vermont v. Brillon* (2009) 556 U.S. 81, 89–90 (*Brillon*), quoting *Barker*, *supra*, 407 U.S. at p. 522.) Rather, to determine whether a speedy trial violation has occurred, *Barker* established a balancing test consisting of "four separate enquiries:  whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." (*Doggett v. United States* (1992) 505 U.S. 647, 651 (*Doggett*).) None of these four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered

36

together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." (*Barker*, *supra*, 407 U.S. at p. 533.) The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant. (See *id.* at p. 532.)

Based on the overall balance of factors in the present case, we conclude that defendant's speedy trial claim fails. In reaching that conclusion, we address the four *Barker* factors in the following order: length of the delay, prejudice, defendant's assertion of the speedy trial right, and who is to blame for the delay.

a. *Length of the delay*

The first *Barker* factor, the length of the delay, encompasses a "double enquiry." (*Doggett*, *supra*, 505 U.S. at p. 651.) "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, [*Barker*, *supra*, 407 U.S. at pp. 530–531], since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. [Citation.] This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." (*Id.* at pp. 651–652; see *id.* at p. 652, fn. 1 ["We note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."].)

In this case, defendant was arrested on July 26, 1995, and brought to trial on July 1, 2002. (See *United States v. Marion* (1971) 404 U.S. 307, 325 [Sixth Amendment speedy trial right attaches when the defendant is "accused," i.e., when he is "arrested, charged, or otherwise subjected to formal restraint prior to indictment"].) This delay of nearly seven years clearly qualifies as " 'presumptively prejudicial' " within the meaning of *Barker*. (See *Doggett*, *supra*, 505 U.S. at p. 652, fn. 1 [noting that "the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year"]; see also *United States v. Loud Hawk* (1986) 474 U.S. 302, 304 (*Loud Hawk*) [90-month delay]; *Serna v. Superior Court* (1985) 40 Cal.3d 239, 252 [four-and-a-half-year delay].)

In a complex case, delay will weigh less heavily against the state because the significance of the delay "is necessarily dependent upon the peculiar circumstances of the case" and because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious . . . charge." (*Barker*, *supra*, 407 U.S. at pp. 530–531.) In the present case, the charges were serious and complex. Defendant was charged, along with a codefendant, with a double homicide and attempted murder for which the prosecution sought the death penalty. This case certainly differs from the routine prosecution of an ordinary street crime. However, in denying defendant's request for *Keenan* counsel, the trial court opined that the case was "not necessarily a more complicated case than any other [capital] case." After taking into account "the seriousness of the offenses," the "nature of the offenses themselves," and "the number of motions that allegedly need[ed] to be filed," the trial court concluded that second counsel was unnecessary to assist in what it believed to be a relatively straightforward death penalty case. Once trial finally began, it concluded within seven weeks. Moreover, even considering the gravity of the charges, a delay of seven years is

"extraordinary."  (*Barker*, *supra*, 407 U.S. at p. 533 ["It is clear that the length of delay between arrest and trial — well over five years — was extraordinary."]; see *Doggett*, *supra*, 505 U.S. at p. 652 [noting "the extraordinary 8 1/2-year lag between [defendant's] indictment and arrest"].)  At oral argument, neither the Attorney General nor counsel for defendant was aware of any other capital case in California with a pretrial delay longer than what occurred here.  In sum, the delay in this case "clearly suffices to trigger the speedy trial enquiry."  (*Ibid.*)  We address further below the significance of the extent to which the delay exceeded the minimum needed to trigger the *Barker* inquiry.

        b.      *Whether defendant suffered prejudice as a result of the delay*

Whether defendant suffered prejudice as a result of the delay must be assessed in light of the interests the speedy trial right was designed to protect:  "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532.)

We have no difficulty concluding, even in light the complexity of the case and the need for adequate preparation, that being jailed without a trial for seven years is "oppressive."  (See *Barker*, *supra*, 407 U.S. at pp. 532–533 ["The time spent in jail is simply dead time."].)  Further, although being charged with a capital crime is bound to cause anxiety and concern under any circumstances, here defendant expressed anxiety and concern about the pretrial delay on the record. There can be no question that the length of pretrial incarceration in this case is a "serious" restraint on liberty with "detrimental impact[s] on the individual."  (*Id.* at p. 532; see *United States v. Marion, supra,* 404 U.S. at p. 320 [arrest and pretrial incarceration "seriously interfere with the defendant's liberty" and "may disrupt his employment, drain his financial resources, curtail his associations,

subject him to public obloquy, and create anxiety in him, his family and his friends"].)

As to whether defendant suffered the "most serious" type of prejudice, the inability to adequately prepare his defense (*Barker*, *supra*, 407 U.S. at p. 532), defendant contends that the delay led to "two specific and concrete losses over and above the generalized problems inevitable in such a lengthy pretrial delay." First, defendant argues that "any meaningful investigation into the third parties motivated to kill Gary Williams was dealt a severe if not fatal blow by the significant time delays." He says, "the number, identities, and motivations of those individuals who wanted to kill or harm Gary Williams came to light very late in the arduous pretrial process," with "[t]he first inkling" of Gary's past surfacing only in March 1997 and the full extent of his criminal activities revealed only in January 2002. According to defendant, had "trial occurred in 1997 or 1998, instead of 2002, . . . the identity and whereabouts of those third parties would much more likely have been ascertained."

Second, defendant argues that the delay allowed the state to "stabilize the testimony of [Conya L.]." He observes that Conya L. offered varying accounts in the weeks and months following the murders, but that she "testified with unfailing certitude" at the trial seven years later. Defendant argues that "[t]he passage of so much time inevitably impacts a person's recall and perception, such that they can crystallize and bring forth certitude from initial uncertainty and equivocation." The record indicates that Conya L.'s testimony at trial differed in some respects from the account she had provided seven years earlier, a point explored during cross-examination by the defense. (*Ante*, at pp. 8–9; *post*, at pp. 76–77, 83–84.)

The Attorney General contends that defendant's claims of prejudice are vague and speculative. We agree. Defendant has not specifically identified what witnesses might have eluded the defense or what testimony might have been lost

40

or distorted as a result of the delay in this case. Defendant has not made any particularized showing of evidentiary prejudice.

The high court has said, however, that "consideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim." (*Doggett*, *supra*, 505 U.S. at p. 655.) "*Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown,' " and "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." (*Id*. at p. 655.)

In explaining "the role that presumptive prejudice should play" in the speedy trial analysis, the high court in *Doggett* said that "its importance increases with the length of delay." (*Doggett*, *supra*, 505 U.S. at p. 656.) The court then discussed how the importance of presumptive prejudice varies with the reason for the delay. On one hand, delay occasioned by diligent prosecution would be "wholly justifiable" and would not support a defendant's speedy trial claim absent a showing of "specific prejudice to his defense." (*Ibid.*) On the other hand, "official bad faith in causing delay will be weighed heavily against the government" and, in a case of extraordinarily lengthy delay, "would present an overwhelming case for dismissal" even without any specific showing of prejudice. (*Ibid.*) *Doggett* went on to explain: "Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . . [¶] . . . Although negligence is obviously to be weighed more lightly than

41

a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, [citation], and its consequent threat to the fairness of the accused's trial." (*Id.* at pp. 656–657.)

In the present case, there is no allegation of official bad faith causing the delay, but we may assume that the delay here, as in *Doggett*, was sufficiently protracted that the presumption of prejudice would weigh heavily in defendant's favor *if* the cause of the delay was official negligence. We examine the all-important question of who is to blame for the delay further below.

           c.        *Defendant's assertion of his right to a speedy trial*

*Barker* rejected "the rule that a defendant who fails to demand a speedy trial forever waives his right." (*Barker*, *supra*, 407 U.S. at p. 528.) But the high court cautioned that its rejection of the demand- or waiver-rule did not mean that a defendant has no responsibility to assert his right. (*Ibid.*) Rather, "the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." (*Ibid.*) "Whether and how a defendant asserts his right is closely related to the . . . [remaining *Barker* factors]. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." (*Barker*, *supra*, 407 U.S. at pp. 531–532.)

In applying this factor, one court has explained: "The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial." (*State v. Couture* (Mont. 2010) 240 P.3d 987, 1003 (*Couture*).)

Defendant says he repeatedly asserted the substance of his right to a speedy trial throughout much of the lengthy pretrial period. He emphasizes that the court itself recognized on several occasions that it was granting delays reluctantly "because I know [defendant] wants a speedy trial." Although defendant acknowledges that he waived time on several occasions, he says he did so because he had no alternative in light of his attorneys' lack of preparation and the prosecution's delays in providing discovery. In response, the Attorney General contends that defendant consented to 17 out of 19 continuances granted by the trial court and that his requests for a speedy trial were, in reality, repeated efforts to fire his various court-appointed attorneys. Further, the Attorney General describes defendant's assertion of his right to a speedy trial as "sporadic," noting that he did not protest delays during the time he represented himself or when he was represented by Mara Feiger, the only attorney who performed to defendant's satisfaction.

The Constitution guarantees a criminal defendant both a speedy trial and effective representation, and it puts the burden of securing both guarantees on the state. (See *Barker*, *supra*, 407 U.S. at p. 527 ["A defendant has no duty to bring himself to trial; the State has that duty *as well as* the duty of insuring that the trial is consistent with due process."], italics added, fn. omitted; cf. *People v. Johnson*

43

(1980) 26 Cal.3d 557, 571 [construing state statutory speedy trial right to mean an indigent defendant need not "choose between the right to a speedy trial and the right to representation by competent counsel"].)  At the same time, we have said that a defendant may not, " 'by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between [the right to a speedy trial and effective representation], in the hope that a reviewing court will find that the trial court has made the wrong choice.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 556 (*Lomax*).)  In the present case, we need not decide whether defendant's pretrial conduct on balance reflected a sincere desire to have a speedy trial or a calculated scheme of delay and refusal to cooperate with counsel.  For even assuming this *Barker* factor weighs in favor of defendant, his speedy trial claim cannot succeed on the record before us for reasons explained below.

    d.  *Who is to blame for the delay*

  In the *Barker* analysis, the reason for the delay is the "flag all litigants seek to capture." (*Loud Hawk*, *supra*, 474 U.S. at p. 315.)  "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker*, *supra*, 407 U.S. at p. 531, fn. omitted.)  In analyzing this factor, we discuss the conduct of the prosecution, the defense, and the trial court in turn.

          (1)

  In examining the record, we are able to isolate only a handful of delays for which the prosecution appears directly responsible.  The prosecutor requested and received continuances totaling about two and a half months — first to consider

44

taking a writ in response to a ruling by the trial court, and later because of his busy trial schedule. The prosecutor was also absent for about three months due to illness, which constitutes a "strong excuse" for delay. (*Barker*, *supra*, 407 U.S. at p. 534.)

Defendant argues that some of the delay in this case is attributable to discovery obstructions by the prosecution. He contends, for example, that the prosecutor "resist[ed] . . . providing [Conya L.'s] contact information" and failed to turn over "FBI reports concerning Gary Williams and his bank and credit union robbery associates." But as explained further below (*post*, at pp. 68–85, 92–95), the prosecution was not obligated to disclose Conya L.'s address, had no duty to turn over the FBI reports, and did not otherwise fail to adhere to its discovery obligations with respect to these materials. Although defendant cites additional examples of the prosecution's alleged delays in producing discovery, the record on appeal does not enable us to conclude that responsibility for the discovery disputes should be attributed to the prosecution.

On the whole, the record shows that the prosecution, far from trying to delay the trial, sought to try this case in a timely manner. At numerous points from the early to the late stages of the pretrial period, the prosecution objected to continuances of the trial date. When defendant appeared to be "in over his head" during the period of his self-representation, the prosecution forcefully objected to the delay and urged the trial court to revoke defendant's *Faretta* status. Similarly, after the sixth year of delay, the prosecutor arranged for Conya L. to address the court and implored the trial judge to deny any further requests for delay. Neither the prosecutor's illness, the back-and-forth of discovery disputes, nor any of the other minor delays discussed above detracts from the overall conclusion that the state prosecuted this case diligently and was prepared to afford defendant a speedy trial.

45

(2)

It is readily apparent from the record that defendant was responsible for the delay arising from three discrete periods of the pretrial process. First, he acquiesced in continuances during a 13-month period from February 1997 to March 1998 when he appeared satisfied with Mara Feiger's efforts to move his case forward. Second, he consistently waived time during the final six months of the pretrial proceedings as Bruce Cormicle prepared for trial. These two periods of delay are properly charged to defendant.

Third, defendant was responsible for the delay that occurred during and after his attempt at self-representation, a period which marks a distinct turning point in the pretrial proceedings. Before defendant assumed *Faretta* status, there is no indication that the trial court believed defendant was responsible for causing delay. To the contrary, the trial court repeatedly recognized that defendant wanted a speedy trial and, after more than four years of delay, responded to defendant's complaints by stating, "I think it's safe to say it's been your concern all along that not enough has been done in your case." After defendant assumed *Faretta* status a year later, however, he began engaging in behavior that the trial court later deemed dilatory. During the 10-and-a-half months defendant represented himself, he failed to subpoena a single witness or turn over any discovery, yet he initiated a malpractice suit against Gunn and filed multiple motions to disqualify the trial judge and the prosecutor. He experienced conflict with his investigator, who eventually wrote a letter to the court stating, "I find it impossible to work with Mr. Williams." During the hearing on June 28, 2001, the prosecutor accused the defendant of having done "everything to delay the proceedings in his dealings with the investigator" and further alleged that defendant had refused to cooperate with his attorneys and was attempting to stall "in the hopes that Conya [would] die[]" and that other witnesses would become unavailable.

46

In a ruling that marks a notable shift in tone, the trial court agreed with defendant that he was "in over his head" and stated that "all of these have been delay tactics." The trial therefore revoked defendant's *Faretta* status. Three weeks later, on August 20, 2001, Gunn asked to withdraw because communication between him and defendant had broken down and because he now believed defendant's pending lawsuit against him posed a conflict. The trial court stated that "it's another way of him delaying this trial by suing you. [¶] Next thing, Mr. Cormicle is going to be sued for malpractice. Where does it end?" A few months later, the trial court chastised defendant for firing his lawyers or representing himself "[w]hen the case . . . gets near the time for trial." These comments make clear that the trial court believed defendant was responsible for the delays during and after defendant's attempt at self-representation, a finding to which we owe deference. (See *Doggett*, *supra*, 505 U.S. at p. 652.) Accordingly, defendant is responsible for the delay during this period as well.

Having accounted for these periods and the other minor delays discussed above, we are still confronted with a period of roughly four years during which defendant was incarcerated awaiting trial. Upon careful review of the record, we think it is clear that the lion's share of delay resulted from defense counsel's lack of progress in preparing this case for trial. However, because we are unable to conclude on appellate review of the record before us that the delay resulted from a "systemic 'breakdown in the public defender system' " (*Brillon*, *supra*, 556 U.S. at p. 94), we must, as a matter of law, charge the delay resulting from defense counsel's lack of progress to defendant.

(a)

From early to late in the pretrial proceedings, the record provides little indication that defense counsel, apart from Feiger and Cormicle, worked diligently on defendant's case. During a *Marsden* hearing on January 17, 1996, after

47

defendant complained that his case was "getting nowhere" and that "[m]y attorney had my case for six months, and it's nothing — it's like we ain't took one step," defendant's attorney Forest Wright said, "He's right. I am too busy. I would like to get rid of a few cases." On May 3, 1996, when defendant again expressed frustration with Wright's lack of progress, Wright said vaguely that "we're not in a position to recite everything at this point, but I know there's been a considerable amount of work done." Wright said that he was proceeding "as diligently as [he could] at this point, given the staff level that [he had] among qualified persons" but that his being "in court every day, all day" was impeding his ability to work on motions.

After defendant again complained on August 30, 1996, that "everything that [defense counsel] stipulated that he needed the extra 60 days for [at the last hearing], . . . still none of them was completed," Wright asserted that "a lot has been done in this matter" and indicated he would be prepared for trial on October 7, 1996. Less than two weeks later, however, Wright indicated he would not be prepared by the October 7, 1996, trial date and requested the appointment of second counsel, which the trial court denied. On September 27, 1996, Wright moved to continue the trial date on the ground that he had "not completed investigation of the 'guilt/innocence phase' of the case" and because his "on-going duties to represent other clients . . . necessitate[d] [his] diligent attention to nine felony cases . . . set for jury trial before the end of November, 1996, and also to one other death penalty case."

In December 1996, Wright provided the prosecution with a list of unresolved discovery issues. With the appointment of Mara Feiger as cocounsel on January 15, 1997, hearings on discovery-related matters began to move forward in February 1997, apparently to defendant's satisfaction. In a motion for a continuance filed on March 28, 1997, Wright stated in a sworn declaration: "In

part, as a consequence of my schedule and case load, I was unable to focus on the instant case to the degree which I should have. The . . . extent of that this situation has affected the present state of preparedness for trial, I must take full responsibility. Since February 1997, however, I have not been assigned new cases."

After more than a year of litigating discovery disputes, the public defender's office declared a conflict requiring Wright and Feiger to withdraw. The public defender's office did not explain the conflict, stating only that it was "a result . . . of information that we received recently from the prosecution . . . we felt should have been provided much earlier in the case." The trial court relieved Wright and Feiger on April 3, 1998, which resulted in six months of apparent inactivity as the criminal defense panel attempted to secure counsel for defendant and as two CDP attorneys, Grover Porter and Douglas Myers, were each appointed but then quickly relieved.

At the beginning of October 1998, John Aquilina was appointed to represent defendant. Over the next several months, Aquilina sought two continuances to evaluate the case and to conduct investigation. On April 23, 1999, seven months into his representation of defendant, Aquilina told the trial court in camera that "no investigation [to] my knowledge has been conducted since the public defender's office was relieved in April of '98." He said that Porter had retained an investigator in June 1998 but that neither Porter nor Aquilina had asked the investigator to "conduct any investigation whatsoever." The record discloses no reason why defense counsel had not utilized the investigator. Aquilina said a new investigator would be available in June 1999. At the same hearing, nearly four years after defendant was arrested, Aquilina said "it would appear all an attorney would have to do [after Wright and Feiger withdrew] is catch up to what has occurred. Quite candidly, I don't see that even five percent

49

of the investigation necessary in the guilt phase of this case has been conducted." Further, Aquilina acknowledged he had not been able to work on defendant's case because he had been engaged on two other capital cases and because "mentally, emotionally, psychologically" he could not handle "three capital cases in one year in a twelve-month period."

After seeking a further continuance on May 13, 1999, Aquilina eventually withdrew from the case on August 30, 1999, because of a conflict of interest. The record does not show that much, if anything, was accomplished in defendant's case during the 11 months of Aquilina's appointment. The table of contents for all records filed during Aquilana's representation shows that there were 11 trial readiness conferences, two motions to continue, two *Marsden* motions, and nothing else.

On September 2, 1999, David Gunn was appointed to represent defendant. Gunn told the court he needed several weeks to evaluate the case and to secure cocounsel. On December 17, 1999, the trial court granted the prosecution's motion to sever defendant's case from that of his codefendant, and Bruce Cormicle joined the case as cocounsel for defendant. On December 21, 1999, Gunn sought a continuance because he had "about eight murder cases still set pending for next year," and the court continued the trial date to October 2, 2000. During an April 7, 2000, status conference, Gunn said in passing that the defense was "on track" but that he had "lost [his] investigator due to family problems" and that he was trying to get new investigators "on board." On June 9, 2000, Gunn told the court that he had just gotten funding approved for an investigator and that before the funding approval, there was "about two months where we kind of lost our ability to have investigative work done." On July 14, 2000, after defendant complained that no investigation had occurred and that "the case been at a stand still for 10 months since Dave Gunn been on the case," Gunn acknowledged that

50

he had lost "three to four months, in terms of actual preparation of the investigation" due to problems finding an investigator and obtaining the requisite funding.  Gunn also acknowledged that the investigator had not met with defendant since funding was approved because of "vacations" and because of the investigator's work on another death penalty case.

The reporter's transcript from September 2, 1999, to August 16, 2000, amounts to only 93 pages, most of which consist of *Marsden* hearings.  The clerk's transcript for this period consists mainly of 11 minute orders noting trial readiness conferences.  Gunn, like Aquilina, did not appear to pursue any of the discovery that Feiger sought from the prosecution in 1997 and that Cormicle finally obtained in 2002.  The record does not indicate how much investigation actually occurred under Gunn's supervision.  Gunn acknowledged that he had lost his investigator by early April 2000, and two years later, Cormicle, who served as cocounsel with Gunn and then inherited the case when Gunn withdrew, said he "basically started from scratch."  If Gunn had made meaningful progress on defendant's case, presumably Cormicle would have known about it.

From August 2000 to June 2001, defendant represented himself, and Gunn was appointed as standby counsel.  After the trial court revoked defendant's *Faretta* status, Gunn resumed his representation of defendant, and the court, at Gunn's request, continued the matter to August 20, 2001.  On August 20, 2001, Gunn asked to withdraw from the case because of a breakdown in his relationship with defendant and because of defendant's malpractice suit against him — a potential conflict that defendant had brought to Gunn's attention 10 and a half months earlier on October 6, 2000.

After Cormicle took over the case, the trial court granted several continuances requested by Cormicle before setting the eventual trial date of July 1, 2002.  Between August 2001 and July 2002, it appears that Cormicle pursued the

case with reasonable diligence. On April 23, 2002, Cormicle complained at length that he was still receiving documents "that should have been turned over seven years ago but were not." The prosecution responded, "The problem with why that was not turned over earlier is because of the revolving door of defense attorneys" who failed to "follow through" with discovery. On April 25, 2002, nearly seven years after defendant was arrested, Cormicle told the court: "We basically started from scratch; nothing had been done for the past six years essentially."

The record thus indicates that most of the delay in this case, apart from the periods already attributed to defendant, resulted from defense counsel's failure to make progress in preparing defendant's case. Consistent with defendant's frequent complaints, defense counsel repeatedly acknowledged — at the beginning, in the middle, and even toward the end of the pretrial period — that little or no work had been done on defendant's case. The problem was exacerbated by what the prosecution called "the revolving door of defense attorneys." Defendant was represented by a total of eight attorneys over the seven-year period — two from the public defender's office (Wright and Feiger) and six from the criminal defense panel (Porter, Myers, Aquilina, Filippone, Gunn, and Cormicle) — each of whom needed time to review the case and many of whom apparently spent months doing little or no work on the case, only to withdraw later because of a conflict.

We are mindful of the weight and complexity of the heavy caseloads that many public defenders carry, and we recognize the essential service that public defenders provide to their clients and to the criminal justice system. Further, we realize that defense counsel generally act out of duty and good faith when they resist subjecting their clients to trial until defense theories and evidence have been fully investigated and developed. Here, however, the apparent inability of multiple attorneys — first Deputy Public Defender Forest Wright and then CDP

52

attorneys Grover Porter, Douglas Myers, John Aquilina, Regina Filippone, and David Gunn — to move defendant's case forward in a timely manner suggests more than the usual challenges facing appointed counsel.

(b)

The question is whether defense counsel's failure to make progress in defendant's case is chargeable to the state or to defendant for purposes of speedy trial analysis. In *Brillon*, *supra*, 556 U.S. 81, the United States Supreme Court established a "general rule" that "delays sought by [assigned] counsel are ordinarily attributable to the defendants they represent." (*Id.* at pp. 85, 94.) The high court cautioned, however, that "the State may bear responsibility if there is 'a breakdown in the public defender system.' " (*Id.* at p. 85.) We must examine whether the delays that occurred in this case were the result of such a breakdown.

The high court has not had occasion to explain what constitutes a breakdown in the public defender system, although it concluded that no such breakdown occurred in *Brillon*. The defendant in *Brillon* was arrested on felony domestic assault and habitual offender charges in July 2001 and convicted by a jury in June 2004. (*Brillon*, *supra*, 556 U.S. at p. 84.) "During the time between Brillon's arrest and his trial, at least six different attorneys were appointed to represent him." (*Ibid.*) Brillon's trial was initially scheduled for February 2002. Four days before jury selection, Brillon's first attorney, Richard Ammons, "moved for a continuance, citing his heavy workload and the need for further investigation." (*Id.* at p. 86.) The trial court denied the motion, at which point Brillon announced: " 'You're fired, Rick.' " (*Ibid.*) Three days later, on the eve of trial, the trial court "granted Ammons's motion to withdraw as counsel, citing Brillon's termination of Ammons and Ammons' statement that he could no longer zealously represent Brillon." (*Ibid.*; see *id.* at p. 86, fn. 3 [noting that Ammons also cited " 'certain irreconcilable differences in preferred approach between Mr.

53

Brillon and counsel as to trial strategy, as well as other legitimate legal decisions' "].) "The trial court warned Brillon that further delay would occur while a new attorney became familiar with the case." (*Id.* at p. 86.)

Brillon's second attorney withdrew almost immediately "based on a conflict." (*Brillon*, *supra*, 556 U.S. at p. 86.) A third attorney, Gerard Altieri, represented Brillon from March 2002 to June 2002. During this period, Brillon moved to dismiss Altieri because of "failure to file motions, '[v]irtually no communication whatsoever,' and his lack of diligence 'because of heavy case load.' " (*Ibid.*) At a June 11, 2002, hearing on Brillon's motion, "Altieri denied several of Brillon's allegations, noted his disagreement with Brillon's trial strategy, and insisted he had plenty of time to prepare." (*Id.* at pp. 86–87, fn. omitted.) Later that day, however, "Altieri moved to withdraw on the ground that Brillon had threatened his life during a break in the proceedings. The trial court granted Brillon's motion to dismiss Altieri, but warned Brillon that 'this is somewhat of a dubious victory in your case because it simply prolongs the time that you will remain in jail until we can bring this matter to trial.' " (*Id.* at p. 87.) "That same day, the trial court appointed Paul Donaldson as Brillon's fourth counsel." (*Ibid.*)

A few weeks later, Brillon complained about Donaldson's "unresponsive[ness] and lack of competence" and, as with Altieri, moved to dismiss Donaldson "for failure to file motions and 'virtually no communication whatsoever.' " (*Brillon*, *supra*, 556 U.S. at p. 87.) When Donaldson reported that his contract with the public defender's office had expired, the trial court released him on November 26, 2002, without making any findings regarding the adequacy of his representation. His fifth attorney, David Sleigh, was appointed on January 15, 2003, but withdrew on April 10, 2003, because of a change to his firm's contract with the public defender's office. Brillon was without counsel for the

54

next four months. His sixth attorney, Kathleen Moore, was appointed on August 1, 2003. Moore filed a motion to dismiss on speedy trial grounds on February 23, 2004, which the trial court denied. Moore brought the case to trial on June 14, 2004. After Brillon was convicted, Moore again filed a motion to dismiss for lack of a speedy trial, which the trial court again denied. (*Id.* at pp. 87–88.)

The Vermont Supreme Court concluded that the three-year delay violated Brillon's right to a speedy trial, reasoning that "delay caused by assigned counsel's 'inaction' or failure 'to move [the] case forward' is chargeable to the State, not the defendant." (*Brillon*, *supra*, 556 U.S. at p. 92.) The United States Supreme Court reversed and held that "delays sought by counsel are ordinarily attributable to the defendants they represent." (*Id.* at p. 85.) The extensions and continuances sought by Brillon's attorneys "must . . . be attributed to Brillon as delays caused by his counsel," and "their 'inability or unwillingness . . . to move the case forward,' [citation], may not be attributed to the State simply because they are assigned counsel." (*Id.* at pp. 92–93.) In support of its holding, the high court said: "A contrary conclusion could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds. Trial courts might well respond by viewing continuance requests made by appointed counsel with skepticism, concerned that even an apparently genuine need for more time is in reality a delay tactic." (*Id.* at p. 93.)

In addition, the high court held that the Vermont court also "erred by treating the period of each counsel's representation discretely" instead of "tak[ing] into account Brillon's role during the first year of delay in 'the chain of events that started all this.' [Citation.]" (*Brillon*, *supra*, 556 U.S. at p. 93.) The high court noted that Brillon had fired Ammons on the eve of trial and that Brillon's "strident, aggressive behavior with regard to Altieri, whom he threatened, . . .

55

likely made it more difficult . . . to find replacement counsel. Even after the trial court's warning regarding delay, Brillon sought dismissal of yet another attorney, Donaldson." (*Ibid.*) The high court explained that "[a]bsent Brillon's deliberate efforts to force the withdrawal of Ammons and Altieri, no speedy-trial issue would have arisen," and that the subsequent delay in his case must be viewed in the context of these earlier events. (*Id.* at p. 94.)

Finally, the high court said: "The general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State." (*Brillon*, *supra*, 556 U.S. at p. 94.) In addition, "gaps result[ing] from the trial court's failure to appoint replacement counsel with dispatch" may be charged to the State. (*Id.* at 85.) In *Brillon*, "the Vermont Supreme Court made no determination, and nothing in the record suggests, that institutional problems caused any part of the delay in Brillon's case." (*Id.* at p. 94.)

The case before us differs from *Brillon* in certain respects. In *Brillon*, the defendant's disruptive conduct during the first year of the pretrial period led to subsequent delay. (*Brillon*, *supra*, 556 U.S. at pp. 93–94.) Here, there is no indication that defendant disrupted proceedings except for his efforts, after waiting five years for a trial, to remove Gunn out of frustration with the lack of progress in his case. As noted, defendant is responsible for the delay caused by his self-representation. But there is no indication that defendant ever acted in a "strident" or "aggressive" manner, or that he ever "threatened [the] life" of his attorneys or made it difficult to appoint counsel. (*Id.* at p. 93.) It is true that defendant filed a malpractice suit against Gunn around October 2000. But unlike "Brillon's role during the first year of delay in 'the chain of events that started all this' " (*ibid.*), defendant's lawsuit occurred more than five years into the pretrial period. Because it appears that Gunn had accomplished little up to that point, it is unlikely

the conflict posed by the lawsuit somehow sapped the defense effort of momentum. Moreover, Gunn acknowledged that defendant had been cooperative with his cocounsel Cormicle. Had Gunn withdrawn earlier instead of waiting until August 2001 to declare a conflict, Cormicle, who eventually brought the case to trial, would have become lead counsel earlier.

Moreover, whereas Brillon sought to dismiss his attorneys (in one instance on the eve of trial) in part because of his own preferences concerning trial strategy (see *Brillon*, *supra*, 556 U.S. at p. 86, fn. 3; *id.* at p. 86 & fn. 4), the record here indicates that defendant's *Marsden* motions (at least those filed before his *Faretta* status) were his way of complaining not about trial strategy but about his attorneys' continual and often conceded lack of progress in preparing for trial. Not all of defendant's *Marsden* motions sought to dismiss counsel; the trial court acknowledged the purpose of defendant's *Marsden* motions when it said in April 1999, "I've held a few Marsden motions with you and a few motions that weren't truly Marsden motions, but when we got to talk about what's going on — and I think it's safe to say it's been your concern all along that not enough has been done in your case."

Because Brillon's conduct during the first year resulted in subsequent delays (see *Brillon*, *supra*, 556 U.S. at p. 94 ["Absent Brillon's deliberate efforts to force the withdrawal of Ammons and Altieri, no speedy-trial issue would have arisen."]), the high court characterized "the three-year delay" as "caused mostly by Brillon" (*id.* at p. 92, fn. 8). Here, by contrast, defendant endured a much longer delay, approximately four years of which resulted from the chronic lack of progress and repeated coming and going of defense counsel notwithstanding defendant's recurring complaints that nothing was being done to bring him to trial.

*Brillon* did not define what constitutes a "systemic 'breakdown in the public defender system.' " (*Brillon*, *supra*, 556 U.S. at p. 94.) But the high court did advert to "institutional problems" (*ibid.*), presumably in contrast to problems with individual attorneys. In this appeal, defendant contends that the "revolving door" of appointed counsel over the lengthy pretrial period qualifies as a " 'systemic breakdown in the public defender system' " within the meaning of *Brillon*. As detailed above, the record indicates that several of defendant's attorneys appeared to make little or no progress in preparing his case for trial. But our specific focus in this inquiry must be on whether a *systemic* breakdown has occurred, not on whether any particular attorney or attorneys performed deficiently. It is possible that the "revolving door" of appointed counsel in this case is indicative of "institutional problems" (*Brillon*, at p. 94) in Riverside County's Indigent Defense Program. But the record on appeal contains no facts that affirmatively support this conclusion. Because defendant did not file a motion to dismiss on speedy trial grounds in the trial court, the underlying cause of the delay in this case was never litigated, the various statements by defendant and his attorneys were never examined in an adversarial proceeding, and the trial court made no findings that might inform the issue before us.

As a result, there is much we do not know about why this case appeared to languish in the hands of several of defendant's attorneys. We do not know whether the unspecified conflict that ended Forest Wright and Mara Feiger's representation after more than two and a half years was reasonably avoidable, or whether it resulted from a flaw in the public defender's mechanism for identifying and avoiding conflicts. We do not know whether the conflict that ended John Aquilina's representation after 11 months could reasonably have been avoided or discovered earlier by Aquilina or by the criminal defense panel, or whether it was

simply an unfortunate but unforeseeable happenstance. We do not know whether the sixth-month delay in 1998 before Aquilina's appointment, during which defendant did not have stable counsel, resulted from problems in the criminal defense panel's assignment system, or whether it resulted from mishaps that could not reasonably be anticipated or prevented. And with respect to the various attorneys who appeared to do little or no work on defendant's case, we do not know whether the lack of progress was attributable to each attorney's own inability to properly manage or prioritize his or her caseload, or whether the performance of individual attorneys was indicative of unreasonable resource constraints, misallocated resources, inadequate monitoring or supervision, or other systemic problems.

As noted earlier, the record in this case suggests more than the usual challenges facing appointed counsel. But in the absence of evidence identifying *systemic* or *institutional* problems and not just problems with individual attorneys, we are unable to conclude on direct appeal that the delay experienced by defendant resulted from a breakdown in the public defender system. In other words, the record before us contains no facts about the public defender *system* that would support a finding of a *systemic* breakdown. Accordingly, on this record, we are required by *Brillon* to charge to defendant the delay in this case resulting from defense counsel's lack of progress.

(3)

We turn finally to the role of the trial court. Defendant contends that the trial court's denial of his motion to sever his case from that of his codefendant "was another significant cause of pretrial delay." But there is a statutory preference for joint trials of jointly charged defendants (§ 1098), and "past decisions of this court make it clear that the substantial state interests served by a joint trial properly may support a finding of good cause to continue a

59

codefendant's trial" (*People v. Sutton* (2010) 48 Cal.4th 533, 560; see also § 1050.1).  During the early stages of the pretrial proceedings, the trial court properly found that the state interests served by a joint trial justified denial of the severance motion.  Later, when it became clear that separate trials would likely be required to obviate *Aranda/Bruton* concerns (see *People v. Aranda* (1965) 63 Cal.2d 518, 530 [severance may be appropriate when prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant]; *Bruton v. United States* (1968) 391 U.S. 123 [nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible at a joint trial]), the trial court agreed to sever the cases.  We find no error in these decisions.

Defense counsel's lack of progress put the trial court in a difficult position. When a defense attorney requests more time to prepare for trial, the trial court must balance a defendant's right to a speedy trial with his right to competent counsel.  (*Lomax*, *supra*, 49 Cal.4th at p. 556.)  "If counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified."  (*Ibid.*)  At the same time, the high court has said that "the primary burden [falls] on the courts and the prosecutors to assure that cases are brought to trial."  (*Barker*, *supra*, 407 U.S. at p. 529.)  In this case, the prosecution was prepared to bring defendant to trial, but the trial court repeatedly indulged defense counsel's requests for continuances due to lack of preparation.

We appreciate the dilemma confronting the trial court and do not suggest that it abused its discretion in granting the 19 continuances that occurred here.  But we note (with the obvious benefit of hindsight) that the trial court could have done more to move this case to trial once the mounting delay became evident.  For example, when Aquilina informed the court in April 1999 that he had done no

60

work on the case but would soon get started, the court accepted Aquilina's assurances and, a few weeks later, continued the trial date. The court did not insist on a timeline for investigation or discovery, or otherwise more closely monitor progress in the case, even as it recognized that the case was "the oldest one in the courthouse." Subsequently, Gunn took over the case in September 1999. Ten months later, in July 2000, defendant complained that no investigation had occurred under Gunn, and Gunn acknowledged he had lost his investigator three or fourth months earlier. Despite these problems, and despite no indication that Gunn had pursued any discovery, the trial court — five years after defendant's arrest — again did not insist on a firm timeline or otherwise hold Gunn's or the CDP's feet to the fire. Instead of conveying a sense of urgency, the court said that "to have adequate representation and be prepared for trial is a must. Whether or not that gets done on a full-time basis working from sun up to sundown for a short period of time, or anything in between that, and working an hour all day for 10 years I don't think is what's important. [¶] What's important is, is there adequate representation at the time we get started at trial? And so I can't even pretend that I know enough or that I have the power or authority to tell Mr. Gunn you must work ex number of hours this week on this case, because he has to manage his calendar. He's got other clients he is also working for. . . ."

In granting continuances at the request of defense counsel, the trial court understandably sought to ensure adequate preparation and a fair trial. "What is clear, though" — to borrow apt language from a decision of a sister high court — "is that the [trial court] accommodated repeated requests to postpone hearings, extend deadlines, and continue the trial based on vague assertions about more time being needed. The record reflects that the court was concerned about [defendant's] right to prepare a defense, but also about the ramifications the delays were having on his right to a speedy trial. And we commend the court for trying

61

to make the best of a difficult situation in which it had to replace defense counsel [multiple] times and, in so doing, had to give new counsel time and leeway to get up to speed on the case. But it must be remembered that ' "the primary burden" to assure that cases are brought to trial is "on the courts and the prosecutors." ' [Citation, quoting *Barker*, 407 U.S. at p. 529.] Furthermore, 'society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.' [*Barker*, at p. 527.] Thus, the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner. [Citation.] And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay. [Citation.] The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders." (*Couture*, *supra*, 240 P.3d at pp. 1009–1010.)

We do not find the trial court directly responsible for the delay in this case. We caution, however, that trial courts must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial.

e.      *Overall balance of* Barker *factors*

As noted, the speedy trial analysis involves "a difficult and sensitive balancing process" that "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." (*Barker*, *supra*, 556 U.S. at pp. 530, 533.) In this case, the length of the delay is extraordinary, far greater than the minimum necessary to trigger the *Barker* inquiry. Further, we have assumed without deciding that during the five years before his self-representation, defendant's repeated assertions of his desire to have a speedy trial were sincere. The remaining two *Barker* factors, however, weigh against defendant. Defendant was directly responsible for three of the seven years of pretrial delay as he waived time to allow his attorneys to

prepare his case and caused delays by attempting to represent himself. His attorneys were responsible for the remaining four years, and because we cannot conclude on this record that the delays caused by defendant's counsel resulted from a systemic breakdown in the public defender system, the delay caused by assigned counsel must be charged to defendant. (*Brillon*, *supra*, 556 U.S. at p. 94.) Defendant has failed to demonstrate specific prejudice resulting from the delay, and despite the oppressive nature of pretrial incarceration and the anxiety it produces, he cannot benefit from a presumption of prejudice because the record does not show that the state was responsible for the delay. (*Doggett*, *supra*, 505 U.S. at pp. 656–657.) Thus, based on the totality of the *Barker* factors, we conclude on this record that defendant's right to a speedy trial was not violated.

3. Speedy Trial Right Under California Constitution and Statutory Law

In passing, defendant mentions that "California statutory law also outlines the right of the accused to a speedy trial." He notes that California's statutory provisions are "supplementary to and a construction of the state constitutional speedy trial guarantee." (*People v. Martinez* (2000) 22 Cal.4th 750, 766.) Defendant declined to brief any speedy trial claim under state law, however, noting simply that "[t]he potential for pretrial delays to fall within one of the California Penal Code's exclusions may well undermine many attempts to appeal on statutory speedy trial grounds." Thus, defendant has effectively conceded he has no meritorious speedy trial claim under California law.

**B.   In Propria Persona Status and Standby Counsel**

1. Revocation of In Propria Persona Status

Defendant next contends that his Sixth Amendment right of self-representation was violated when the trial court revoked his *Faretta* status. He argues that "[t]he trial judge's rationale for termination of [defendant's] *Faretta*

63

rights — that [defendant] was using dilatory practices — is not supported by the record." We disagree.

A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. (*Faretta, supra*, 422 U.S. 806; *People v. Marshall* (1997) 15 Cal.4th 1, 20.) "A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers." (*People v. Valdez* (2004) 32 Cal.4th 73, 97–98.) Erroneous denial of a *Faretta* motion is reversible per se. (*People v. Dent* (2003) 30 Cal.4th 213, 218.)

However, the right of self-representation is not absolute. "[The] government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." (*Martinez v. Court of Appeal* (2000) 528 U.S. 152, 161.) "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Faretta*, *supra*, 422 U.S. at pp. 834–835, fn. 46; see also *People v. Butler* (2009) 47 Cal.4th 814 ["The court may deny a request for self-representation that . . . is intended to delay or disrupt the proceedings."].) "Thus, a trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation. The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' " (*People v. Welch* (1999) 20 Cal.4th 701, 735.)

Because we have already recounted the relevant factual background and procedural history above, we highlight here only the most salient points. When the trial court granted defendant's request to represent himself on August 16, 2000, defendant assured the trial court that he would be prepared for trial by February 5, 2001. By the time the trial court revoked defendant's *Faretta* status on June 28, 2001, defendant had exceeded this deadline by almost five months. While proceeding in propria persona, defendant requested and received two continuances and did not object to a third continuance requested by standby counsel.

During the 10-and-a-half-month period during which defendant represented himself, defendant repeatedly complained about David Gunn and made multiple motions to remove him as standby counsel despite the fact that the trial court had made clear that Gunn had no control over defendant and played no role in defendant's preparation of his defense. Defendant also filed three separate motions to disqualify the trial judge pursuant to Code of Civil Procedure section 170.1; moved to disqualify the prosecutor pursuant to Penal Code section 1424; and filed a motion for a change of venue. These motions were denied. During the same period, defendant did not subpoena any witnesses or turn over any discovery.

The record demonstrates that defendant did not engage in efficient investigation and trial preparation. Although the prosecutor represented to the trial court that he had given his investigator's phone number to defendant, defendant did not make contact with the investigator. Defendant claimed that the investigator never answered the phone, but the prosecutor countered that defendant never actually called. During a June 15, 2001, trial readiness conference, the trial court said that it had received a letter from defendant's court-appointed investigator notifying the court that the investigator was "no longer" on the case and asking for his appointment to be terminated. In the letter, the

65

investigator stated: "I find it impossible to work with Mr. Williams." The trial court granted the investigator's request and relieved him from the case. On June 28, 2001, when the trial court asked defendant if he had retained a new investigator, defendant stated: "No. I do plan on, yes."

During a hearing on June 28, 2001, the prosecutor alleged that defendant was engaging in delay tactics and urged the trial court to relieve defendant of his *Faretta* status. According to the prosecutor, defendant had "done everything to delay the proceedings in his dealings with the investigator," and defendant was "no closer to trial today than he was a year ago." In response, defendant challenged the prosecutor's factual representations but also acknowledged that he was "in over [his] head." He then stated: "I — at this point, I'm kind of, like, fed up. Whatever y'all want to do. . . . This is your house. I'm burnt out. [¶] . . . So if you want to take my pro per status, fine. This is your courtroom. Do what you want to do. I don't care. But don't give it to [attorney David Gunn]. That's the whole thing I've been fighting. That is why I filed the motion to remove him as standby counsel, because when he was counsel he ain't doing nothing."

The trial court then issued the following ruling: "I make the following findings: That [defendant] has had — and I do not know the number of Marsden motions. I can't even count the number of lawyers that he's had. . . . [¶] I find that I agree with [defendant], he's in over his head. And that all of these have been delay tactics. And I'm going to remove him from his pro per status."

"[T]he *Faretta* right is forfeited unless the defendant ' "articulately and unmistakably" ' demands to proceed in propria persona." (*People v. Valdez*, *supra*, 32 Cal.4th at p. 99.) By conceding that he was in over his head and acquiescing to the revocation of his *Faretta* status, defendant did not unmistakably demand to continue in propria persona. Defendant has therefore forfeited this claim. (See *People v. Rudd* (1998) 63 Cal.App.4th 620, 628–630 [holding that

defendant forfeited his objection to an order revoking his pro se status by raising it for the first time on appeal].)

Forfeiture aside, defendant's claim fails on the merits. By the time defendant's *Faretta* status was revoked, defendant had been proceeding in propria persona for over 10 months and had missed the ready-for-trial deadline by five months. During this period, defendant did not conduct any meaningful investigation or engage in any discovery. Defendant conceded, and the trial court found, that he was "in over his head." The trial court did not abuse its discretion in finding that defendant had engaged in "delay tactics" in the course of his self-representation. Accordingly, we find no violation of defendant's Sixth Amendment right to self-representation.

### 2. Standby Counsel

Defendant next asserts that the trial court's refusal to remove attorney David Gunn as standby counsel while he was proceeding in propria persona "denied [defendant] the assistance of conflict-free counsel throughout the ten months of his representation, in violation of the Sixth Amendment." Defendant is incorrect.

It is well-established that "a defendant has no right, under either the federal or state Constitution, to 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them, and the right under the federal Constitution to represent themselves, but these rights are mutually exclusive." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119–1120, fn. omitted.) "Of course, a State may — even over objection by the accused — appoint a 'standby counsel' . . . to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46.) We have explained that "standby counsel . . . *takes no active role in the defense*, but attends the proceedings so as to be familiar with the

67

case in the event that the defendant gives up or loses his or her right to self-representation . . . ." (*People v. Moore*, *supra*, 51 Cal.4th at pp. 1119, fn. 7, italics added.)

Because defendant had no Sixth Amendment right to *any* counsel while he was proceeding in propria persona, he certainly had no Sixth Amendment right to assertedly "conflict-free" standby counsel.  Accordingly, even assuming that Gunn did have a conflict of interest, defendant's claim fails.

## C.      Prosecution's Obligations Under *Brady v. Maryland*

Defendant contends that the prosecution failed to timely disclose certain discovery materials he maintains were favorable to the defense, thus violating his due process rights under *Brady*, *supra*, 373 U.S. 83.  "Under the federal Constitution's due process clause, as interpreted by the high court in *Brady* . . . , the prosecution has a duty to disclose to a criminal defendant evidence that is ' "both favorable to the defendant and material on either guilt or punishment." ' [Citations].  The prosecution's withholding of favorable and material evidence violates due process 'irrespective of the good faith or bad faith of the prosecution.' [Citation.]" (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333.)  "For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132.)  "[The] touchstone of materiality is a 'reasonable probability' of a different result . . . .  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " (*Kyles v. Whitley* (1995) 514 U.S. 419, 435.)  In determining whether evidence is material under this standard, we consider " 'the

effect of the nondisclosure on defense investigations and trial strategies.' "
(*People v. Verdugo* (2010) 50 Cal.4th 263, 279.)

The prosecution is obligated to disclose favorable and material evidence "whether the defendant makes a specific request [citation], a general request, or none at all [citation]." (*In re Brown* (1998) 17 Cal.4th 873, 879.) "The scope of [the prosecution's] disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to the others acting on the government's behalf . . . .' [Citation.]" (*Ibid.*) A determination that the prosecution improperly withheld material information requires reversal without further harmless error analysis. (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 435; *People v. Zambrano*, *supra*, at p. 1133.)

Defendant contends that the prosecution violated its *Brady* obligations by failing to timely disclose (1) information regarding Gary's criminal activities and associates; (2) a four-page FBI report regarding prosecution witness Robert Scott; (3) information regarding a potential prosecution witness, Tami Wilkerson; and (4) the address of prosecution witness Conya L. We address each contention in turn.

1. Gary's Criminal Activities and Associates

Defense counsel represented to the trial court that during a meeting with the prosecutor on January 9, 2002, he came across a previously undisclosed one-page document entitled "Gary and 100 bandits" outlining the numerous bank robberies Gary was believed to have committed with the assistance of various associates. During in-court conferences held on January 23, 2002, and March 29, 2002, defense counsel requested and received continuances of the trial date to investigate these robberies and the individuals involved. During the March 29, 2002, conference, defense counsel represented that the FBI had recently granted him

access to files pertaining to these matters and maintained that he needed more time to review the materials. On May 1, 2002, defense counsel requested and received an additional continuance to investigate the potential for "third-party liability," i.e., the possibility that one of Gary's associates had committed the charged crimes. Jury selection began on July 1, 2002.

Defendant now argues that "[t]he prosecution's undue delay in revealing the existence of potentially exculpatory evidence related to Gary's numerous robberies and associates with motives to kill him . . . resulted in a denial of the defense's ability to fully investigate those materials or to render a complete defense at trial."

However, the fact that victim Gary Williams had been involved in bank robberies was no secret; his history as a bank robber had been disclosed at the very beginning of the case. As early as the preliminary hearing on January 4, 1996, for example, defense counsel cross-examined Conya L. regarding her knowledge of Gary's criminal activities. Further, the prosecution stipulated at trial that Gary was a bank robber who had worked in conjunction with other bank robbers, and Scott testified that he and Gary had worked together to commit over 20 armed credit-union robberies during the early 1990s. Thus, the critical facts regarding Gary's past had been fully disclosed, and the defense was free to investigate. The fact that defense counsel did not appear to investigate diligently for much of the pretrial period has no bearing on the *Brady* analysis: "the prosecutor had no constitutional duty to conduct defendant's investigation for him." (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) "Because *Brady* and its progeny serve 'to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery,' the *Brady* rule does not displace the adversary system as the primary means by which truth is uncovered. [Citation.] Consequently, 'when information is fully available to a defendant at the time of

70

trial and his only reason for not obtaining and presenting the evidence to the Court is [the defendant's] lack of reasonable diligence, the defendant has no *Brady* claim.' " (*Ibid.*)

Moreover, defendant's last attorney, Cormicle, learned of the existence of the "Gary and 100 bandits" document more than six months before the trial began. Cormicle was granted three separate continuances to conduct additional investigation into the possibility of third-party culpability. He requested and received further information regarding the robberies from the FBI. Because it appears that no evidence was in fact "suppressed" and that defense counsel had adequate time to conduct additional investigation, defendant's *Brady* claim is without merit.

2.      Prosecution Witness Robert Scott

On April 23, 2002, defense counsel indicated that he had only recently received "a four-page report from the FBI that was in the possession of the district attorney pertaining to Robert Scott." During an ex parte hearing held two days later, defense counsel explained that the four-page document was a "proffered statement" from Robert Scott "where he's presumably looking to cut a deal with the US Attorney." Defendant apparently contends that the belated disclosure of this evidence violated his due process rights.

Defendant's argument is without merit. Defense counsel received the four-page "proffered statement" — a letter signed by Robert Scott and addressed to the district attorney — over two months before the trial began. The letter was introduced into evidence during the trial, and Scott was cross-examined extensively regarding its meaning and his motivations for preparing the document. Among other things, defense counsel elicited that Scott was hoping "to get out before [he] had to complete the 11 years and six months that [he had been] given"

71

on a robbery conviction by offering "testimony in connection with [defendant's] case." Accordingly, there was no suppression of evidence and no *Brady* violation.

### 3. Potential Prosecution Witness Tami Wilkerson

During a hearing on April 23, 2002, defense counsel "cited a need for information on a prior criminal incident committed by prosecution witness Tami Wilkerson that could be used to potentially impeach her testimony." He contends that the prosecution had possessed this information for several years before it was turned over. However, defendant does not assert, and the record does not reflect, that the prosecution ever called Tami Wilkerson to testify. Because there was no testimony to impeach, defendant's *Brady* claim is without merit.

### 4. Conya L.

Defendant contends that the prosecution violated its *Brady* obligations by failing to provide discovery regarding Conya L.'s whereabouts. But defendant cites no case that has held that the prosecution's refusal to disclose a witness's *address*, without more, constitutes a *Brady* violation, and he acknowledges that none of the cases he cites "explicitly discuss[es] the prosecution's failure to provide access to *potentially* material information." The absence of any authority supporting defendant's position is not surprising. "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ." (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559; see also *Wardius v. Oregon* (1973) 412 U.S. 470, 474 ["[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . ."].) Moreover, "*Brady* does not require the disclosure of information that is of mere speculative value" (*People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1472), and defendant himself concedes that "it remains speculative as to what might have been discovered." He acknowledges that there is no way to know "if disclosure of [Conya L.'s] address would be helpful or harmful to [defendant's] defense."

72

Because defendant has not shown that the prosecution withheld evidence that was both "favorable and material" to the defense (*In re Bacigalupo*, *supra*, 55 Cal.4th at p. 333), his claim is without merit. (We address defendant's claims that withholding of Conya L.'s address violated his statutory rights and the confrontation clause below, *post*, at pp. 73–85.)

### 5. Cumulative Impact

"[W]hile the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively." (*In re Brown*, *supra*, 17 Cal.4th at p. 887.) Because we have found that the prosecution did not suppress any evidence that was favorable to the defense, we reject defendant's cumulative error argument.

## D. Prosecution Witness Conya L.

Defendant raises a number of arguments regarding the investigation and examination of the prosecution's main witness, Conya L. Specifically, he argues that the state was required to disclose Conya L.'s current address pursuant to section 1054; that the state prevented defendant from meaningfully cross-examining Conya L. in violation of the Sixth and Fourteenth Amendments by failing to disclose her address; and that the trial court improperly limited certain lines of inquiry during cross-examination in violation of the Sixth and Fourteenth Amendments. After summarizing the factual background, we address each of these arguments in turn.

### 1. Factual Background

On July 15, 1995, Conya L. was attacked and her throat was lacerated by two knives. After narrowly escaping with her life, she provided an account of the attacks to the police. Conya L. then fled the state shortly after her release from the hospital.

73

On December 14, 1995, defendant's codefendant Ronald Walker requested a continuance of the preliminary examination. The prosecutor opposed the request, stating that Conya L. had received a "death threat" and that the threatening party had represented to Conya L. that he knew where she was and intended to carry out a "hit" on her in the immediate future.

During the preliminary hearing on January 4, 1996, Conya L. testified at length and was subject to cross-examination by both defense counsel. At one point during the hearing, the prosecutor asked Conya L. if she had received any death threats, and Conya L. answered, "yes." When the prosecutor attempted to inquire further, both defense counsel objected on the ground of relevance. Their objections were sustained.

On February 28, 1997, the parties agreed that Conya L.'s address would be redacted from her medical records before those documents were turned over to the defense. On March 7, 1997, however, defense counsel requested unredacted copies of Conya L.'s medical records, which included her current address. The trial court instructed the parties to brief the issue.

On May 16, 1997, the prosecution submitted the sealed declaration of Tony Pradia, an investigator employed by the Riverside County District Attorney's Office. Investigator Pradia declared that defendant and his codefendant were admitted Crips gang members; that Conya L. had received two separate death threats on or about December 19, 1995, warning her that she would be killed if she attempted to testify at the preliminary hearing; that Detective Gary Thompson had received information from an informant that Conya L. and her six-year-old son would be murdered prior to the preliminary hearing; that Conya L. had been relocated both before and after the preliminary hearing in response to these threats; that Conya L.'s continued cooperation was critical to an ongoing investigation into the identity of the third perpetrator; and that Pradia would not be able to ensure

74

Conya L.'s continued safety if her address were disclosed to the defense. At a hearing held the same day, defense counsel argued that the alleged threats were hearsay. She also argued that any danger to Conya L. could be minimized if Conya L.'s address were disclosed only to defense counsel and not to defendant himself.

On June 6, 1997, after taking the matter under submission, the trial court ruled that the prosecution was not required to disclose Conya L.'s address or telephone number to the defense.

During a hearing on May 1, 2002, Conya L. spoke in support of the prosecutor's request to proceed to trial without any further delay. She stated that she had relocated every time she had received a death threat. She further stated: "People tell me all the time that the defendant has asked about my whereabouts. He inquires about my whereabouts. And he sends messages through other people to give to me. I hear this all the time. And it's very stressful."

During the trial, defense counsel called Conya L. as part of the defense case. Before calling her to the stand, defense counsel indicated to the trial court that he wished to introduce evidence that Conya L. "had a warrant out for her arrest at the time" that the crimes were committed. Defense counsel explained that Conya L. had been convicted of welfare fraud on November 27, 1991 and placed on probation for two years. As part of her conviction, she was ordered to pay a $350 fine by February 25, 1992. When Conya L. failed to pay the fine, a warrant was issued for her arrest. Conya L. did not pay the fine for over three years. The prosecutor objected that evidence of the warrant should be excluded under Evidence Code section 352 because it would invite the jury to speculate as to the reason the warrant had been issued. Citing *People v. Wheeler* (1992) 4 Cal.4th 284, the trial court responded that "the fact that the warrant was issued on a *Wheeler*-type impeachment would not be admissible. The underlying facts are."

75

Defense counsel then clarified that he wished to introduce evidence of the warrant not just for impeachment purposes, but also to explain Conya L.'s absence from the state. The trial court noted that such evidence would "open[] up some doors that you probably don't want to open up," at which point defense counsel responded: "Okay."

Defense counsel then called Conya L. to testify. During the examination, Conya L. admitted that she had been convicted of misdemeanor welfare fraud in 1991. She further admitted that she had lied in an employment application in 1992 by falsely declaring that she had never been convicted of a misdemeanor; she had signed the application under penalty of perjury. She repeated the same lie in a 1996 employment application, although this time not under penalty of perjury. Finally, Conya L. admitted that she had been convicted of two misdemeanors in 1994: false impersonation and fraudulent use of a Medi-Cal card.

On cross-examination, the prosecutor attempted to rehabilitate Conya L. by eliciting that she had been young and poor at the time she had committed the subject crimes. Before redirect, defense counsel informed the trial court that he intended to ask Conya L. about her ability to pay the court-ordered fine and whether she had failed to report income on her applications for government assistance. The prosecutor objected that this evidence was cumulative, arguing that Conya L. had already admitted to failing to report income. The trial court limited this line of inquiry to the following question: "You previously admitted that you failed to report that income . . . and you signed under penalty of perjury that you would report all of your income; isn't that correct?"

2.      California Penal Code

Defendant argues that "Conya [L.'s] testimony was the State's case." He notes that she was the sole percipient witness and that there was no forensic evidence linking anyone to the charged crimes. Indeed, as the prosecutor himself

76

remarked, the prosecution's case "hing[ed] substantially, if not entirely, upon [Conya L.'s] identification" of the individuals responsible for the crime.

In light of the crucial importance of her testimony, defendant argues that the prosecution was required to disclose Conya L.'s address pursuant to section 1054. He further contends that the prosecution's failure to disclose this information precluded meaningful confrontation and cross-examination of this important witness in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Under the Penal Code, the prosecutor must disclose the names and addresses of the individuals whom he intends to call at trial. (§ 1054.1, subd. (a).) "The disclosure may be made to defense counsel, who is prohibited from revealing, to the defendant or others, information that identifies the address or telephone number of the prosecution's potential witnesses, absent permission by the court after a hearing and a showing of good cause. (§ 1054.2.) . . . . Absent a formal court order directing earlier disclosure, discovery must be provided at least 30 days prior to trial, 'unless good cause is shown why a disclosure should be denied, restricted, or deferred.' (§ 1054.7.) 'Good cause' is defined for purposes of this provision as 'threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigation by law enforcement.' (*Ibid.*) Section 1054.7 additionally provides that upon the request of any party, the court may permit a showing of good cause — for the denial or regulation of disclosures — to be made in camera." (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1132–1133 (*Alvarado*).) "Orders under this section are subject to review for abuse of discretion." (*People v. Panah* (2005) 35 Cal.4th 395, 458.) We have held that these provisions of the Penal Code are constitutional (*Izazaga v. Superior Court* (1991) 54 Cal. 3d 356), and that "[a] defendant does not have a fundamental due process right to pretrial

77

interviews or depositions of prosecution witnesses" (*Panah*, *supra*, 35 Cal.4th at 458).

Notwithstanding defendant's assertions to the contrary, the trial court clearly had "good cause" to deny disclosure of Conya L.'s address. As noted, Conya L.'s testimony was crucial to the prosecution's case. Conya L. testified that she had received death threats, and Investigator Pradia submitted a sworn declaration stating that Conya L.'s life had been threatened and that disclosure of her address would jeopardize her safety and compromise the integrity of an ongoing investigation. Because there were "threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, [and] possible compromise of other investigations by law enforcement" (§ 1054.7), the trial court did not abuse its discretion in finding good cause to deny defendant's request.

The analogous case of *People v. Panah*, *supra*, 35 Cal.4th 395, is instructive. In that case, the prosecution requested that a witness's "out-of-state address not be disclosed to defendant based on allegations that he had conspired with others to kill her and another witness." (*Id.* at p. 457.) The trial court granted the prosecution's request. (*Id.* at p. 458.) We concluded that "where there appears to have been a credible allegation of potential injury to the witness, we find no abuse of discretion." (*Ibid.*)

Defendant contends that the trial court could have mitigated the danger to Conya L. by ordering that her address be disclosed only to defense counsel and not to defendant. But defendant misapprehends the good cause exception to the disclosure requirement. Pursuant to section 1054.2, the default rule is that "the address or telephone number of a victim or witness whose name is disclosed to the attorney pursuant to subdivision (a) of Section 1054.1" may not be disclosed to the "defendant, members of the defendant's family, or anyone else." (§ 1054.2,

78

subd. (a)(1).)  The exception codified in section 1054.7 allows the trial court to deny *even such limited disclosure* when the prosecution can show good cause. Because we have found that the trial court did not abuse its discretion in finding good cause in this case, defendant's argument is without merit.  Accordingly, we find no violation of the reciprocal discovery statutes of the California Penal Code.

       3.      Sixth Amendment Right to Confrontation

Nor did the trial court's order violate defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution.  The Sixth Amendment guarantees the right of an accused in a criminal prosecution " 'to be confronted with the witnesses against him.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 (*Van Arsdall*).)  "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400 (1965), 'means more than being allowed to confront the witness physically.' *Davis v. Alaska* [(1974)] 415 U.S. [308,] p. 315.  Indeed, ' "[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." ' (*Id.*, at pp. 315–316 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940) (emphasis in original)." (*Van Arsdall*, at p. 678.)  The high court has said that "when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness'[s] name and address open countless avenues of in-court examination and out-of-court investigation.  To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." (*Smith v. Illinois* (1968) 390 U.S. 129, 131, fn. omitted; see also *Alford v. United States* (1931) 282 U.S. 687, 692 ["Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them."].)

79

"The right of confrontation is not absolute, however [citations], 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " (*Alvarado*, *supra*, 23 Cal.4th at pp. 1138–1139.)  The high court has not "establish[ed] an inflexible rule requiring disclosure of a witness's identity and address in all circumstances." (*Id.* at p. 1142.)  To the contrary, as we explained in *Alvarado*, withholding "*only* . . . the residential *address*" of even a crucial witness may be permissible "when the risk posed to a witness's safety is grave enough." (*Ibid.*; see, e.g., *People v. Watson* (1983) 146 Cal.App.3d 12, 20 [in permitting nondisclosure of the prosecution witness's address, the court found that the defendant "was not deprived of a substantial right" because he already had presented "ample evidence . . . to place the witness . . . in his proper setting and accurately to evaluate his credibility"]; *People v. Castro* (1979) 99 Cal.App.3d 191, 200–204 [defense sought the address of the prosecution's witness for the purpose of impeachment, but because the witness already had been impeached as a drug addict, felon, and cheat, the court found that the defense had presented "sufficient environmental background" to allow the jury to judge the witness's credibility].)  "Numerous decisions handed down in the federal courts similarly have held that where the identifying information, such as a witness's true name and address, was deemed to be inconsequential to material issues to be contested at trial, nondisclosure was permissible on the basis that the lack of such information did not prejudice the defense." (*Alvarado*, *supra*, 23 Cal.4th at p. 1143, fn. 10; see, e.g., *United States v. Persico* (2d Cir. 1970) 425 F.2d 1375, 1383–1384 [fear for the witnesses' personal safety justified the trial court's refusal to disclose their correct address and place of employment, where the witnesses were well known to the defense and the defense failed to demonstrate a "particularized need" for the information]; *United States v. Contreras* (5th Cir. 1979) 602 F.2d 1237, 1239–1240 [reasonable concern for a Drug Enforcement

80

Administration agent's safety justified trial court's refusal to require disclosure of his home address where the defendant "had ample opportunity to place the witness in his proper setting" and where nondisclosure of the address "could not have prejudiced defendant"]; *United States v. Avalos* (5th Cir.1976) 541 F.2d 1100, 1117 [observing "that the Supreme Court . . . had established no hard and fast rule regarding questions about [current] addresses," and the defendants had failed to show prejudice from the nondisclosure of such information involving two government witnesses who had been placed in a witness protection program]; *United States v. Crockett* (5th Cir. 1975) 506 F.2d 759, 762–763 [government's strong basis for believing that its witnesses' lives were in danger justified the trial court's order permitting nondisclosure of their residential addresses, and the defendants demonstrated no prejudice].)

In this case, competent evidence indicated that Conya L.'s life was at risk. "[T]he state's ability to afford protection to witnesses whose testimony is crucial to the conduct of criminal proceedings is an absolutely essential element of the criminal justice system" (*Alvarado*, *supra*, 23 Cal.4th at pp. 1149–1150), and withholding certain information to protect Conya L.'s safety was therefore justified as long as the trial court's protective orders did not in fact "significantly impair" defendant's "ability to investigate or effectively cross-examine" Conya L. (*Id.* at p. 1147). We find no such significant impairment in this case. Unlike in *Alvarado*, in which the prosecution permanently concealed the identities of crucial prosecution witnesses and allowed those witnesses to testify anonymously at trial (*id.* at p. 1125), in this case only Conya L.'s then address was withheld from the defense. Her name and identity were known to the defense seven years before trial. (See *People v. Valdez* (2012) 55 Cal.4th 82, 108 (*Valdez*) [finding no constitutional violation where, among other things, "the record [did] not support

81

defendant's assertion that the witnesses' identities were unknown to the defense until the moment the witnesses took the stand"].)

Moreover, defendant does not argue that the prosecution withheld information concerning where Conya L. had been living at the time the instant offenses were committed. Information regarding where Conya L. had been living at time of the subject crimes would surely have been more useful for the purpose of gathering reputation evidence than information regarding the location of the out-of-state community where Conya L. had lived for only a short period of time. (See *People v. Panah*, *supra*, 35 Ca1.4th at p. 458 ["The trial court observed the information about [the witness's] reputation in her new community, in which she had lived for only a brief time, was of minimal relevance, if any."]; *State v. Novosel* (1980) 120 N.H. 176, 184 ["[O]n direct examination, the defendant and jury were told where the witness lived at the time of the offense. [Citation]. The witness had moved to another state at the time of trial, but the likelihood that a jury would be aided by the knowledge of what state, much less the precise city and street, is tenuous at best."].) Notably, defendant did not call any witness to testify as to Conya L.'s reputation in the Southern California community where she had lived when the crimes were committed. Defendant's decision not to call any such witnesses undermines his claim that reputation evidence was necessary to impeach Conya L.'s testimony even after her credibility had been called into question by other evidence.

Further, as in *Valdez,* the record demonstrates that "the court's protective orders did not in fact 'significantly impair' defendant's 'ability to investigate or effectively cross-examine' " Conya L. (*Valdez*, *supra*, 55 Cal.4th at p. 111.) As noted, the preliminary hearing gave defense counsel the opportunity to cross-examine Conya L. almost seven years before trial began. During pretrial discovery, the defense was given access to Conya L.'s medical records and

criminal history.  During the trial, defense counsel impeached Conya L.'s testimony by eliciting that she had lied on employment applications, fraudulently used a Medi-Cal card, and willfully committed welfare fraud and perjury.  Defense counsel also took advantage of cross-examination to highlight inconsistencies in Conya L.'s various accounts and to suggest that her identification of defendant was suspect.  Finally, during closing argument, defense counsel made an array of arguments challenging Conya L.'s credibility.

For the foregoing reasons, we reject defendant's argument that the prosecution's nondisclosure of Conya L.'s current residential address prevented him from meaningfully confronting and cross-examining Conya L. in violation of the Sixth and Fourteenth Amendments.

4.      Limitation on Cross–examination

In a separate but related argument, defendant contends that the trial court improperly limited defense counsel's cross-examination of Conya L. during the trial.  Specifically, he maintains that the trial court prevented him from eliciting the fact that there was a warrant for Conya L.'s arrest at the time the crimes were committed and from inquiring as to whether Conya L. had the ability to pay a court-ordered fine.

Defendant's arguments are without merit.  When defense counsel indicated that he wished to introduce evidence of the warrant to explain Conya L.'s absence from the state, the trial court cautioned that the introduction of such evidence would "open[] up some doors that you probably don't want to open up" — i.e., further exploration of the death threats that Conya L. had received.  Defense counsel acknowledged the trial court's warning and declined to ask Conya L. about the warrant.  Accordingly, defense counsel voluntarily elected not to introduce evidence of the warrant.  Defendant does not assert deficient

83

performance by his counsel in this regard, and he presents no reason for us to second-guess his trial counsel's litigation decision.

Defendant next asserts, without citation to the record, that Conya L. lied about her ability to pay the court-ordered fine. The record indicates that defense counsel intended to prove that Conya L. had lied about her ability to pay because "she had $6,000 that she had gotten from the sale of [a] car . . . that she stuffed into [a] vacuum cleaner bag." Even assuming that this isolated fact, which had already been presented to the jury in a different context, had marginal relevance to Conya L.'s general financial condition, Conya L. had already admitted to failing to report income under penalty of perjury. Evidence Code section 352 allows for the exclusion of evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's decision to admit or exclude evidence pursuant to Evidence Code section 352 " ' "will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice." ' " (*People v. Thomas* (2011) 51 Cal.4th 449, 485, quoting *People v. Cain* (1995) 10 Cal.4th 1, 33.) The trial court did not abuse its discretion in concluding that additional inquiry into Conya L.'s financial situation and her truthfulness regarding that situation would "necessitate undue consumption of time" on a point that was, at best, of marginal relevance.

## E.     Introduction of Assertedly Prejudicial Evidence

Defendant next argues that the prosecution introduced "inflammatory and damning evidence" that compromised defendant's "ability to receive a fair trial in violation of the due process clause of the 14th Amendment." Specifically, he contends that the trial court improperly admitted evidence that Conya L. had

received death threats and that defendant was a member of a gang. Neither of these assertions is persuasive.

1.      Death Threats

      a.      *Factual Background*

Out of the presence of the jury, the prosecutor informed the trial court that he intended to introduce evidence that Conya L. had received death threats. He argued that such evidence would explain Conya L.'s inability to remember "minor details" and allow the jury to accurately assess her demeanor. Defense counsel objected to the introduction of this evidence, arguing (1) that the threats had been made many years ago and no longer affected Conya L.'s demeanor, (2) that it was unclear whether any threats had in fact been made, and (3) that such evidence would be unduly prejudicial because the jury would be left with the impression that the threats had originated from defendant.

After hearing from both sides, the trial court ruled that it would allow a "narrow" line of inquiry regarding whether Conya L. had received death threats, so long as the threats were in no way attributed to defendant. The trial court found that the evidence was relevant to assessing Conya L.'s testimony, reasoning: "I do believe that a threat on somebody's life, no matter who makes it, until there's a resolution of all the cases, that threat does [a]ffect one's ability to recall. It [a]ffects one's ability to think about it. I think a death threat has a tremendous impact on a witness's demeanor, ability, especially with the facts that we know." The trial court further found that, pursuant to Evidence Code section 352, the "probative value [of the evidence] outweigh[ed] [its] prejudicial effect."

During the prosecutor's direct examination of Conya L., the prosecutor elicited the following testimony:

"Q: Now, is there another reason why you're nervous about testifying in this case?

85

"A: There's been death threats.

"Q: Okay. Over the last seven years have you received threats on your life?

"A: Yes, I have.

"Q: And have these threats gotten to you through third persons or independent mediaries [*sic*]?

"A: Yes, they have.

"Q: And are you in fear for your life as you testify in this case?

"A: Yes, I am.

"Q: Does that fear also make it hard to remember exactly what happened and what happened next?

"A: Yes."

On cross-examination, Conya L. testified that none of the alleged threats were received directly; rather, they were relayed to her by third parties:

"Q: I believe you testified on direct that you had received death threats in this case; is that correct?

"A: That's correct.

"Q: Was this a threat that you had received . . . as through a third party; correct?

"A: Correct.

"Q: You did not receive anything directly; correct?

"A: That's correct.

"Q: And which individuals relayed this information to you?

"A: One was relayed to me by Mr. Thompson, [Detective] Gary Thompson.

"Q: Was there any other threat?

"A: Yes

"Q: And who was that relayed to or relayed by?

86

"A: My sister.

"Q: And was that Tanya?

"A: Yes.

"Q: Was there any other threat?

"A: Yes.

"Q: And who was — who relayed that to you?

"A: The person begged me not to reveal their name."

After this testimony was elicited, defense counsel asked the trial court to provide the jurors with the following instruction: "You have received evidence of threats to a witness. If you believe that evidence to be true you must limit that evidence solely to considering the effect on the demeanor of that witness. There is no evidence that the defendant Robert Williams was responsible for those threats." The trial court expressed some concern that "the last sentence . . . sounds like I'm making a comment on the evidence." He therefore suggested that the parties stipulate that no evidence had been introduced that the defendant had made any death threats. Both parties agreed to this procedure, and defense counsel expressly withdrew his prior request. Accordingly, the following stipulation was presented to the jury: "There is no evidence that Robert Williams made a threat to any witness in this case."

   b.    *Analysis*

"Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible." (Evid. Code, § 780.) "Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; see also *People v. Gonzalez* (2006) 38 Cal.4th

87

932, 946 [" 'An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court.' "].)  The trial court therefore correctly found that this evidence was relevant and admissible, subject to a balancing of its probative value and prejudicial effect under Evidence Code section 352.

As noted, Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)  "[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  [Citation.]  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Applying this standard, we find no abuse of discretion.  The trial court appropriately found that the evidence was probative in that it would allow the jury to accurately assess the credibility of the prosecution's central witness.  The trial court limited any potentially prejudicial effect by allowing only a "narrow" line of inquiry regarding whether Conya L. had received threats and by admonishing the prosecutor to make clear that the threats were not attributable to the defendant.

88

The parties also stipulated that "[t]here [was] no evidence that [defendant] made a threat to any witness in this case."

Relatedly, defendant argues that the trial court erred in failing to give defendant's proposed limiting instruction to the jury. Evidence Code section 355 provides that "[w]hen evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) In this case, although defense counsel initially requested a limiting instruction, he expressly withdrew his request and agreed with the trial court's suggestion that the parties instead stipulate that there was no evidence defendant had made any threats to any witness. Because defendant withdrew his request for a limiting instruction, he cannot now complain of the trial court's failure to give a specific and particularized instruction that the evidence could be considered only for a limited purpose.

Additionally, even if defendant had maintained such a request and the trial court had erred by refusing to give the instruction, any error would have been harmless because it is not reasonably probable that defendant would have obtained a more favorable result had the instruction been given. (*People v. Miranda* (1987) 44 Cal.3d 57, 83.) By stipulation, the jury was informed that there was "no evidence" that defendant had threatened any witness in the case. The jury was instructed that it was required to accept this stipulation "as proven," and we presume that the jurors followed the trial court's instructions. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292.) Accordingly, we presume that the jurors did not improperly consider Conya L.'s testimony as evidence that defendant made any threats to any witness in the case.

89

## 2. Gang Affiliation

Defendant contends that evidence of defendant's "gang affiliation" was introduced to the jury "for no other reason than to taint [defendant] as a violent and dangerous man in the minds of the jurors." He argues that evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act. (Evid. Code § 1101; see also *People v. Ruiz* (1998) 62 Cal.App.4th 234, 240 ["[E]vidence of gang membership should be excluded if the evidence is only relevant to prove a defendant's criminal disposition."].)

The record belies defendant's factual assertion that the prosecution introduced evidence of defendant's gang affiliation. As noted, witness Robert Scott testified for the prosecution. Scott testified that two weeks before the murders of Gary and Roscoe, defendant pressed a gun into Gary's neck and threatened that he would kill Scott, Gary, and Gary's family unless Gary turned over a portion of the proceeds from his bank robberies to defendant. On cross-examination, defense counsel elicited that Gary and Scott robbed "federal credit unions with loaded guns." On redirect, the prosecutor asked Scott why he was afraid of defendant when he himself was a bank robber with access to guns. At this point, the trial court called a recess.

Outside the presence of the jury, the prosecutor represented to the trial court that Scott was afraid of defendant because he believed defendant was a "gangster." The prosecutor agreed that any suggestion that defendant was a "gangster" or a member of a "gang" would be more prejudicial than probative. He argued, however, that Scott's fear of defendant was relevant to the jury's assessment of Scott's demeanor and credibility, especially with respect Scott's claim that he and Gary had committed their most recent robbery in response to defendant's threat. He therefore suggested that Scott could explain his fear of defendant by testifying that he understood defendant to be a person willing to "jack" people, or a "jacker."

90

Defense counsel objected that this evidence would be hearsay and unduly prejudicial.

Pursuant to Evidence Code section 352, the trial court ruled that the probative value of referring to defendant as a "jacker" outweighed its prejudicial effect, with "the admonition that it's not being offered for the truth of the matter, but only as to the state of mind of this witness . . . ."

After the jury reentered the courtroom, the following testimony was introduced:

"Q: Mr. Scott, . . . [w]hy were you so scared of this guy?

"A: Because he was a jacker. He — he was crazy, you know.

". . . .

"Q: Okay. When you use the term "jacker," do I understand correctly . . . , in your opinion — this is just limited to your opinion, not for the truth of the matter — that he was somebody who would just rip off anybody?

"A: He would jack anybody —

"Q: Okay.

"A: — for anything.

"Q: Okay. That was your opinion?

"A: Yes, sir.

"THE COURT: I'm going to admonish the jury that there statements and the opinions by Mr. Scott of Mr. Williams are only being offered to show Mr. Scott's state of mind, and they are not to be considered for any truth of the matter that might be in the opinion. [¶] Is that satisfactory, gentlemen?

"MR. CORMICLE: Yes, your Honor.

"MR. RUIZ: Yes, Judge."

Defendant argues that it was clear from this testimony that "Scott was using the term 'jacker' as a substitute for gangster." But there is no reason to believe

91

that the jury would have understood Scott's fleeting mention of the word "jacker," which was defined as someone who would "just rip off anybody," to mean that defendant was a member of a gang. Accordingly, defendant's argument that the trial court improperly admitted evidence that defendant was member of a gang is without merit.

## F.    Prosecutorial Misconduct

Defendant claims that "[i]n his zealousness to convict and garner a death verdict for [defendant], Prosecutor Ruiz lost sight of the ethical responsibilities every prosecutor owes to the accused." He asserts six specific claims of misconduct. "First, . . . there were systematic obstructions in discovery. Second, Ruiz interfered with the appointment of defense counsel. Third, Ruiz delayed in relaying information regarding an informant that created a conflict and caused the Public Defender to withdraw, thus significantly delaying the onset of trial and forcing one of several changes in representation for [defendant]. Fourth, he offered a disingenuous argument which resulted in the termination of Robert's self representation. Fifth, he misrepresented that Robert's clothing was missing and then misrepresented the testing of the clothing. Finally, Ruiz insisted that the trial go forth knowing that there was still third party culpability evidence that had not been disclosed." Defendant contends that the "cumulative impact of these instances of misconduct so permeated the pretrial as to deny Robert Williams a fair trial and due process under the Fourteenth Amendment."

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair. [Citation.] Generally, a claim of prosecutorial misconduct is not cognizable on

92

appeal unless the defendant made a timely objection and requested an admonition. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 444.) "In order to be entitled to relief under federal law, defendant must show that the challenged conduct was not harmless beyond a reasonable doubt." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35.)

Defendant's first claim of prosecutorial misconduct is premised on his contention that the prosecution violated its *Brady* obligations and that the prosecution's withholding of Conya L.'s address violated defendant's rights under the Penal Code and the United States Constitution. Because we have already rejected these claims (*ante*, at pp. 73–85), defendant's first claim of prosecutorial misconduct also fails.

Second, defendant claims that the prosecutor committed misconduct by "interfering with the appointment of defense counsel." However, the incident to which defendant refers involved the prosecutor's attempt to secure replacement counsel *for codefendant Walker*. After Walker's first counsel withdrew from the case, the prosecutor attempted to find Walker a replacement attorney who could be ready for trial in less than a year. Because the prosecutor's alleged "interference" had nothing to do with defendant or his counsel, it is not relevant to this appeal

Third, defendant claims the prosecutor delayed in relaying information that revealed a conflict of interest between the public defender's office and defendant. On April 3, 1998, the public defender's office declared a conflict with defendant. A representative of the public defender's office, Attorney Floyd Zagorsky, indicated that the conflict was "a result . . . of information that we received recently from the prosecution . . . we felt should have been provided much earlier in the case." However, he did not explain this assertion, stating: "I'm not at liberty to divulge, obviously, what the nature of the conflict is." He later repeated: "Again, I do not believe that I can discuss the nature of any information that

93

relates to this conflict." In the absence of any other evidence in the record, the unexplained assertion by a representative of the public defender's office is insufficient to show misconduct by the prosecution.

Fourth, defendant maintains that the prosecutor acted improperly by arguing that defendant's *Faretta* status should be revoked because he was engaged in delay tactics. But the trial court agreed with the prosecutor, and we have determined that the trial court did not abuse its discretion in revoking defendant's *Faretta* status on that basis. (*Ante*, at pp. 64–67.)

Fifth, defendant contends that the prosecutor "misrepresented critical evidence to the court." Specifically, he takes issue with the prosecutor's representation that he had a tape recording of Walker stating that he had been with "Robert Williams" on the night of the murders, when in fact Walker had said only that he had been with "Rob" that night. Defendant fails to explain how the prosecutor's inference that the "Rob" to whom Walker referred in the tape was "Robert Williams" constitutes prosecutorial misconduct. Moreover, contrary to defendant's suggestion, the trial court was not misled by the prosecutor's statement because it was independently familiar with the tape. The prosecutor was similarly imprecise in summarizing other portions of the tape (e.g., the prosecutor referred to "bloody clothing" when the tape referred only to "clothing"), but again the trial court was independently familiar with the tape and reasonably concluded that any errors in description were unintentional. Defendant also highlights the prosecutor's inaccurate representation that no tests had been performed on the clothing that defendant had been wearing at the time of his arrest in Las Vegas. Twenty days later, however, the prosecutor corrected this representation and produced the results of the tests. These errors, which were later corrected, do not rise to the level of misconduct.

Sixth, defendant argues that the prosecutor "delayed disclosing third-party culpability evidence that many of Gary Williams's former associates had a motive to harm [Gary] and then compounded the error" by opposing defendant's many continuance requests. As previously noted, however, the prosecution disclosed the critical facts regarding Gary's criminal history at the outset of the case, and defendant's final defense counsel was granted three separate continuances to conduct additional investigation into his theory of third-party culpability. (*Ante*, at pp. 70–71.)

In sum, none of the prosecutor's actions, either singly or in combination, constitutes misconduct.

## G.    Jury Issues

### 1.    Excusal of Prospective Jurors for Cause

Defendant contends that the trial court violated his right to an impartial jury under the federal Constitution by erroneously excusing Prospective Jurors D.W. and E.W. for cause because of their views on the death penalty. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*); *People v. Moon* (2005) 37 Cal.4th 1, 13.) "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975, quoting *Witt*, 469 U.S. at p. 424.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10 (*Duenas*).)

####    a.    *Prospective Juror D.W.*

On his juror questionnaire, Prospective Juror D.W. affirmed that he had "philosophical, religious or moral feelings that would make it difficult or

impossible for [him] to sit in judgment of another person." When the trial court asked him to expand on this response, D.W. stated: "I want to explain that I am really against the state taking the life of another person." The trial court then asked D.W. "if the evidence, everything and the aggravating factors are overwhelmingly pointing toward the death penalty, would you be able to vote for death?" D.W. replied: "You know, the only thing that I can say, like, I don't know. And it's, like, an emotional thing but also a philosophical thing. If it's a heinous crime, probably. I don't know. But I can't just — put it in cement and say yes or no."

During voir dire, the prosecutor asked all of the prospective jurors to "nod" if they could offer him the assurance that during the guilt phase of the trial they would be able to follow the law and put aside considerations of "punishment" or "sympathy." The prosecutor stated that should any prospective juror fail to nod, he "would know you don't want to go through that." As to D.W., the prosecutor noted: "I didn't see you nod your head. Okay." The prosecutor then asked: "[D.W.], can you give us assurance that you would do that [sentence a man to death], if you feel it is warranted under the facts and the law?" D.W. replied: "I can't give you an answer, but most likely I could if it's a heinous crime."

The prosecutor challenged D.W. for cause, citing D.W.'s uncertainty about being able to follow the law if it conflicted with his morals. The prosecutor also noted that he was troubled that D.W. had written "not applicable" in response to questions asking him to describe his feelings regarding how "African Americans are treated by the criminal justice system" and to give his views concerning "the three most important problems with the criminal justice system."

In considering the prosecution's challenge, the trial court stated: "He . . . said, in answer to your direct question, 'Could you do it?' and he hesitated very long. And he did not ever say yes. I want to say he said no. But I can't be that

96

bold, but I think he said no. It certainly was not a yes . . . ." The trial court then solicited the views of defense counsel, who replied: "Submit it, your honor." The trial court then ruled: "I'm going to grant [the prosecution's challenge for cause] as to [D.W.]. I think the law is very clear, that based upon a properly phrased question, if the person cannot say that they would be able to vote for death, that that would be proper grounds for challenge for cause."

b.      *Prospective Juror E.W.*

On her juror questionnaire, Prospective Juror E.W. was asked to describe her "general feelings regarding the death penalty." E.W. responded: "I don't want to sentence anyone to death. If convicted of a serious crime, I think they should be sentenced for the rest of their life without parole." In response to a separate question, E.W. indicated that her religious group "does not advocate death" and that she was not interested in "condemn[ing] anybody to death." She explained: "I don't want to be in conflict with my spiritual beliefs. I don't want to have to agonize over whether I did something against God and his teaching." E.W. further stated that her views were premised on her "religious conviction[s]" and that she would "always vote for life without possibility of parole" over death.

When the trial court asked her to elaborate on her responses, E.W. stated: "I thought about it. I would be able to vote for the death penalty . . . . I don't want to condemn anybody to death, but if the evidence is overwhelming, as you say, and that has to be the sentence, then so be it." She agreed that imposing death would create a "conflict" with her God and spiritual beliefs, but indicated that she felt she could "go ahead and vote for [death]" if required. She would deal with the conflict by "ask[ing] God to forgive" her.

During voir dire, the prosecutor asked E.W. to ask herself: "Do I trust this legal system enough to be able to say I can make a life or death sentence either way following the laws I'm given by this system, and mean it for both sides? I

want you to think about that. [E.W.]?" E.W. responded: "Yes." Inquiring further into the conflict E.W. had described between her spiritual beliefs and her ability to impose a death sentence, the prosecutor asked: "[E.W.], I want you to think about this. Do you really want to find yourself asking those questions when that man's life hangs in the balance? And you know that if you don't vote for death, there will not be a death verdict in this case. Do you really want that kind of conflict and pressure in your life?" E.W. responded: "No, I do not." The prosecutor then asked: "[E.W.], can you come in here and sentence this man to death, if you feel it's warranted?" E.W. responded: "I believe I would have a difficult time."

The prosecutor challenged E.W. for cause, stating that she should be excused for her views on the death penalty because she "didn't think that [she] could do it." Asked for his views, defense counsel replied: "I'll submit it, your Honor." The trial court then dismissed E.W., stating: "[B]oth [E.W. and another prospective juror] gave, and in answer to the direct question, could you do it [sentence someone to death], answer to the direct question they both said no."

c.      *Analysis*

When asked to respond to the prosecutor's for-cause challenges, defense counsel submitted the question to the trial court. " 'Hence, as a practical matter, he "did not object to the court's excusing the juror[s], but . . . also refused to stipulate to it." [Citation.] Although "this failure to object does not forfeit the right to raise the issue on appeal, . . . it does suggest counsel concurred in the assessment that the juror[s] [were] excusable." ' " (*People v. Hawthorne* (2009) 46 Cal.4th 67, 82; see *Witt, supra*, 469 U.S. at pp. 434–435 [in light of counsel's failure to question the prospective juror or object to her excusal for cause, "it seems that . . . no one in the courtroom questioned the fact that her beliefs prevented her from sitting"]; *People v. Schmeck* (2005) 37 Cal.4th 240, 262 (*Schmeck*).)

98

Moreover, substantial evidence supports the trial court's finding that, based upon their demeanor and responses, the views of Prospective Jurors D.W. and E.W. would prevent or substantially impair the performance of their duties. (*Schmeck*, *supra*, 37 Cal.4th at p. 262.) Both jurors indicated at various times that, in light of their views concerning capital punishment, they would be unable to consider the death penalty as a reasonable possibility. (*Ibid.*) On his questionnaire, D.W. affirmed that he had "philosophical, religious or moral feelings that would make it difficult or impossible for [him] to sit in judgment of another person." During voir dire, he was unable to say if he would be able to vote for death even "if the evidence . . . and the aggravating factors are overwhelmingly pointing toward the death penalty." On her questionnaire, E.W. indicated that she would "always vote for life without possibility of parole" over death. During voir dire, E.W. could not affirm she was capable of imposing a death sentence even if she believed "it's warranted." Although defendant is correct that at times each prospective juror gave equivocal or conflicting responses, under such circumstances the trial court's determination as to the juror's actual state of mind is binding if supported by substantial evidence. (*Duenas*, *supra*, 55 Cal.4th at p. 10.) After giving appropriate deference to the trial court's determination regarding the state of mind of these prospective jurors, we find the trial court's ruling fairly supported by the record and conclude that the trial court did not err in excusing Prospective Jurors D.W. and E.W. for cause.

2. *Wheeler/Batson* Claim

Defendant, who is African American, contends that the prosecutor improperly exercised peremptory challenges against three African American prospective jurors for racial reasons.

99

a. *Procedural Background*

Voir dire began on July 22, 2002. Following dismissals for hardship, 103 prospective jurors remained. The parties then stipulated to the dismissal of a number of jurors for cause, leaving 70 prospective jurors in the pool. These jurors were then examined in groups of 24.

With respect to the initial group of prospective jurors, defense counsel successfully challenged three for cause. The prosecutor then challenged four prospective jurors for cause: D.W., R.A., E.W., and J.M. The trial court excused all of these individuals with the exception of J.M., an African American.

Following the for-cause dismissals, the trial court and the parties agreed to litigate any peremptory challenges to African American prospective jurors outside the presence of the jury. It was further agreed that defense counsel would not be required to make a prima facie showing of discrimination and that the prosecutor would simply state his reasons supporting each challenge.

The prosecutor indicated he would be challenging Prospective Juror C.H. and explained his reasons for doing so. Defense counsel then made a *Wheeler* motion, which the trial court denied. The prosecutor also indicated that he anticipated asserting a peremptory challenge against J.M. Defense counsel made a *Wheeler* motion as to J.M. The trial court noted that the prosecutor had already voiced his concerns with respect to J.M. during his for-cause challenge, and stated: "[T]here are more race neutral reasons to challenge [J.M.] that we went over on the challenge for cause than there is on [C.H.]. [¶] So I would deny the motion for him also." Because the prosecution had not yet asserted a peremptory challenge against J.M., however, the trial court clarified that if such a challenge were made, "the record is clear that Mr. Cormicle has made a *Wheeler* motion, and that it's been heard, and the Court will deem that motion being timely, even though it was premature."

100

After questioning the second group of 24 jurors, the prosecutor indicated that he anticipated utilizing a peremptory challenge against Prospective Juror S.F., an African American. The prosecutor explained his reasons for the challenge, and defense counsel made a *Wheeler* motion. The motion was denied. The trial court then mentioned J.M., at which point the parties and the trial court agreed that the challenge to J.M. had already been resolved.

The prosecutor declined to exercise any peremptory challenges against two other African American prospective jurors. During subsequent rounds of challenges, the prosecutor passed and accepted the panel six separate times with those two jurors seated. The jury ultimately selected included two African American jurors and one African American alternate juror.

  b.  *Analysis*

The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution and his right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Batson v. Kentucky* (1986) 476 U.S. 79, 97 (*Batson)*; *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).)

"The three-step inquiry governing *Wheeler/Batso*n claims is well established." (*People v. Lomax, supra,* 49 Cal.4th at p. 569.) "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike

101

has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).) In order to prevail, the defendant must show that "it was more likely than not that the challenge was improperly motivated." (*Id.* at p. 170.)

In this case, the trial court did not require defendant to establish a prima facie case and instead simply requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination. Thus, the question of whether defendant established a prima facie case is moot. (*People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8 (*Lenix*).) "Accordingly, we focus on the third *Wheeler/Batson* prong and examine whether the African American panelists were excused due to intentional discrimination." (*People v. Lomax*, *supra*, 49 Cal.4th at p. 570.) " 'At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' " (*People v. Jones* (2011) 51 Cal.4th 346, 360.)

We have stated that "[r]eview of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " (*Lenix*, *supra*, 44 Cal.4th at pp. 613–614.)

(1)     Prospective Juror C.H.

Prospective Juror C.H. initially failed to fill out several pages of his questionnaire; the trial court therefore returned the form to allow C.H. to complete it.  In response to question 27, which asked whether the prospective juror had any friends or relatives who had been arrested or charged with a crime, C.H. indicated that he had an uncle who had been convicted of drug charges and was sentenced to five years in prison.  In response to question 66, which asked how African Americans are treated by the criminal justice system, C.H. wrote, "unfairly and unjust."  Similarly, in response to question 66B, when asked whether African Americans "are treated fairly in our courts," C.H. answered, "Rarely."  In response to question 74, which asked whether any member of the prospective juror's family had died from unnatural causes, C.H. indicated that his uncle had been murdered.  In response to question 82B, which asked whether he would be able to follow the law requiring him to consider all aggravating and mitigating factors before determining the appropriate sentence, C.H. checked, "No."  C.H. also wrote "N/A" in response to several questions, including question 78A ("What are your GENERAL FEELINGS regarding the death penalty"), question 78B ("What are your GENERAL FEELINGS regarding life in prison without the possibility of parole?"), question 79A ("Do you feel that the death penalty is used . . ."  "Too often," "Too seldom," or "About right"?), and question 86 ("What are your impressions of life in prison without the possibility of parole as a punishment for murder?").  When asked which adjective most accurately described his philosophy regarding the death penalty, C.H. marked, "[n]eutral."

During voir dire, C.H. indicated that he had been confused when he answered "no" to question 82B.  When asked to explain why he felt African Americans were treated unjustly by the criminal system, C.H. responded:  "Family history, that's about it. . . .  Uncles and, like, cousins were unjustly prosecuted.

103

That's it." Upon further questioning from the trial court, C.H. acknowledged that he did not know whether his relatives actually had been unjustly treated or whether they merely felt they had been mistreated.

In explaining his reasons for exercising a peremptory challenge against C.H., the prosecutor stated that he used a "three strikes system." "If an individual hits what I think are three negative answers, regardless of race, the three strikes and you're out, basically are the wisdom of my approach." According to the prosecutor, C.H. had accumulated the following "strikes": (1) he had an uncle in prison for drug charges; (2) he believed African Americans were "rarely" treated "fairly" in the court system; (3) he believed his relatives had been unjustly prosecuted; (4) his uncle had been murdered (the prosecutor explained that this reason was not one of his strikes, but noted that "that is a question"); (5) he answered "not applicable" in response to various questions about the death penalty; and (6) he initially failed to answer question 82A, which asked whether he would be able to fairly consider all the evidence presented during the penalty phase. The prosecutor stated that C.H.'s failure to answer that question was particularly important, explaining that question 82A was "the acid test question for me. . . . He just refused to answer that." The prosecutor noted that C.H. had "bagged [*sic*] off a little bit" on his views about the fairness of the justice system during *voir dire*, but explained that "[a]s a prosecutor on a death penalty case, I cannot take that kind of chance and have a loaded gun up there like that."

Defense counsel responded as follows: "I'm not sure how much importance we should give to the lack of answers on those series of questions the first time around. He did fill it out a second time around. [¶] And they seemed fairly neutral, but he did get around to filling those out. Secondly, his explanation as to why he would say unfairly and unjustly prosecuted once, he realized his error of his own analysis, which was just relying on the word of his relatives as opposed

to really thinking about was there something there live, any proof? [¶] . . . I think he did come to realization that his initial position was erroneous, that he should not have made such a blanket statement without actually having analyzed the circumstance of those statements that were made about his relatives.

"With respect to the relative that is in prison, I think we have other people is this that [*sic*] shake out differently. I'm not sure Mr. Ruiz will challenge those people as well. I'm not sure that that that necessarily throws him in any special category. [¶] I think we have [another juror] with a brother-in-law on death row in North Carolina. . . . [¶] And with regard to having an uncle that I believe was murdered, again I believe that there's several people on this jury panel that have been victims of crimes or have relatives that are victims of crimes. [¶] . . . I'm not sure that that would justify the challenge that the prosecutor is urging is race neutral."

The trial court then ruled as follows: "I've listened to Mr. Ruiz's reasons. Let me start out with saying I agree with Mr. Cormicle that [C.H.] did, in fact, change his answers in light of my questioning of him, that especially about the uncles and the cousins. That is the part that really stuck in my mind, that he said, no, that it was word of mouth from them. [¶] . . . [¶] Now unfortunately, at this point, . . . let's see if [other prospective jurors] meet the same three tests Mr. Ruiz uses, the same thought process on a caucasion, for instance. I don't know that answer. [¶] But I think these reasons are good enough to defend against a *Wheeler* motion. And I would deny the *Wheeler* motion, with that caveat that I'm kind of operating in the blind here. But I would expect Mr. Ruiz to use the same standards on evaluating a caucasion speculative juror as he does [C.H.]. [¶] . . . I'm going to have to deny it based upon what I have at this point."

Further, the trial court said to the prosecutor: "[P]art of my decision was made on the idea that you said you're using the three strikes. My reference to

using the same standard on a caucasion is if you get a caucasion that's got the three — or fails the three strikes test, are you going to use the same judgment on that person?  That is where I'm in the dark at this point because I don't know.  [¶] . . . [¶] . . . I'm going to assume that the lawyers are upfront with me —  [¶] . . . [¶] — until they prove that they can't be trusted.  And so, therefore, you get the benefit of the doubt . . . ."

In the trial court, defendant did not later renew his *Batson/Wheeler* challenge to the strike of C.H. based on the prosecutor's subsequent decisions to strike or not strike prospective jurors based on his "three strikes system."  In this appeal, defendant argues that the prosecutor's stated reasons were insufficient to justify striking Prospective Juror C.H.  We disagree.

On this record, we find that the trial court made " 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " and thus " 'its conclusions are entitled to deference on appeal.' " (*Lenix*, *supra*, 44 Cal.4th at p. 614.)  The trial court indicated that it listened to the prosecutor's stated reasons and defense counsel's response, and it did not indiscriminately accept the prosecutor's reasons.  Instead, the trial court said it agreed with defense counsel that during voir dire C.H. had changed his answer about the fairness of the justice system upon realizing he lacked substantiation for his earlier concern about unjust prosecution of his uncles and cousins.  Presumably, then, the trial court viewed with some skepticism the prosecutor's reliance on C.H.'s views about the fairness of the justice system.  As for the prosecutor's reliance on a "three strikes system," the trial court ultimately told the prosecutor "you get the benefit of the doubt," but not before putting the prosecutor on notice that it "would expect [the prosecutor] to use the same standards on evaluating a caucasion" and expressing caution that, at this early stage of the peremptory strikes, it did not know one way or the other whether the prosecutor would apply the system consistently.  Further, the record

supports the prosecutor's statements that C.H. had an uncle in prison for drug charges, that C.H. indicated on his juror questionnaire that he believed African Americans were "rarely" treated "fairly" in the court system, and that C.H. answered "not applicable" to various questions about the death penalty. Defense counsel, while mentioning other jurors with some individual attributes similar to C.H.'s, did not later contend that the prosecutor applied the "three strikes system" inconsistently. In sum, the record shows that the trial court, through a sincere and reasoned effort to evaluate the prosecutor's stated reasons, determined that defendant had not shown it was more likely than not that the reasons were pretextual, and substantial evidence supports the trial court's determination.

(2)     Prospective Juror S.F.

On his questionnaire, Prospective Juror S.F. indicated that his cousin had been convicted of discharging a weapon in public. He noted that he and his relatives had been victims of serious crimes (three of his cousins had been murdered) and that the response of the judicial system and law enforcement was "not good enough" because "nothing was done." When asked about his opinion of the judicial system, S.F. responded that "[i]t needs work." In response to question 38, which asked "what are the three (3) most important problems in the current criminal justice system," S.F. wrote, "Corrupt police, money buys everything, laws." S.F. reported that he had been "jumped" by individuals of another race and that the experience had made him dislike that race, but he also indicated that he was "over that now." He also reported that he had been harassed by three police officers. In response to question 66, which asked how African Americans are treated by the criminal justice system, S.F. wrote, "We are treated worse than any other race." He wrote that "African Americans have never been treated on equal ground" and indicated that they are rarely treated fairly in the courts. When asked to describe his general feelings regarding the death penalty, S.F. wrote, "I am not

107

for the death penalty; because, whether guilty or innocent your life is in someone else's hands." He indicated that the death penalty is used "[t]oo often" and wrote that "[t]oo many people innocent to have the death penalty." He described himself as "[s]trongly against" the death penalty, writing, "I believe God is the only one to decide what to do with life." He added, however, that his opinions would not make it difficult for him to vote for the death penalty because "God says to live by the laws of the land," and "I don't feel an innocent or guilty man's blood will be on my hands." When asked if there were any aggravating or mitigating factors he would refuse to consider during the penalty phase of the trial, S.F. indicated that he would refuse to consider the age of the defendant at the time of the crime and whether the defendant was an accomplice to the offense.

During voir dire, the trial court asked S.F. why he wrote on his questionnaire that he believed the death penalty was used "too often." S.F. answered, "Well, I feel that in a lot of situations the death penalty isn't necessary. And there have been mistakes made where people have been put on death row, and they found out that that person was not guilty. And I think that if there is an option of putting someone in prison without parole, that's a better opinion." Asked to elaborate, S.F. said that "my religious belief is that I should abide by the laws of the land. If the laws of the land are for me to choose the death penalty, and there's not other options, then I have no other options, I have to choose the death penalty. [¶] But if I have an option, then I would rather choose life in prison." When asked about his perception that African Americans are treated unfairly by the criminal justice system, S.F. clarified that he was referring to the "life that African Americans had to go through in the 60s and 50s and 70s," and noted that "[i]t's not as bad now."

In exercising a peremptory challenge against S.F., the prosecutor explained that S.F. was "strong antideath penalty." He added: "And there are other reasons

108

that I think are valid as to [S.F.], the anti law enforcement, biased, the anti court system bias, when it comes to treatment of African Americans." The trial court agreed, explaining, "As to [S.F.], I believe that he — the same standard that you have used on non black, specifically, white jurors, that he is — he comes in with a bias against law enforcement and against the court system, as it pertains to fair treatment for African Americans. And he has a strong antideath penalty [perspective], even though he said he could vote for the death penalty in a certain case. All of his other answers say that that was really truly stretching it for him."

Substantial evidence supports the trial court's reasoned assessment. S.F.'s written and verbal responses indicated that he strongly opposed the death penalty. S.F. also believed African Americans were treated unfairly by the criminal justice system (at least historically), and he expressed a degree of mistrust of the judicial system and law enforcement; the prosecutor could legitimately excuse him for those reasons. Accordingly, we affirm the trial court's ruling.

(3) Prospective Juror J.M.

Defendant argues that the prosecutor improperly struck prospective juror J.M. As an initial matter, the Attorney General contends, without citation to the record, that "[defendant's] complaint on appeal regarding Prospective Juror [J.M.] is specious since, contrary to [defendant's] assertion [citation], the record reflects that the prosecutor never even exercised a peremptory challenge against Prospective Juror [J.M.]." But this is simply incorrect. The record clearly shows that J.M. was dismissed on July 24, 2002, the day after the court preemptively ruled that it would deny defendant's *Batson*/*Wheeler* motion if jury selection got as far as J.M. and if the prosecutor struck J.M.

On the merits, defendant's claim with respect to J.M. fails. In his questionnaire, J.M. indicated that he had served on a jury before and "didn't like it" because the "defense lawyer did a poor job." He reported that his mother and

109

sister had been victims of crime and that the response of law enforcement to both incidents had been "poor." When asked about his opinion of the judicial system, he responded that "it doesn't always lead to justice." In response to question 38, which asked "what are the three (3) most important problems in the current criminal justice system," he wrote, "Prosecutors who try to convict regardless of guilt; overcrowding of prisons; plea bargaining." He had an unpleasant experience with a peace officer when he disputed a traffic ticket. When asked if he had any reason to be biased either for or against criminal prosecutors, he wrote, "Yes media cases indicating manipulation of evidence to convict whether guilty or not." When asked if he had any reason to be biased either for or against criminal defense attorneys, he wrote, "Yes the last one I witnessed did a poor job." He indicated that he had "experienced racial prejudice by white race" and that he had "[m]ild" "racial attitudes or prejudices" because of "past experiences of racial prejudice in routine everyday life." He felt African Americans were treated unfairly by the criminal justice system and that whether they were treated fairly in the courts depended on the individuals involved in each case. When asked to describe his general feelings regarding the death penalty, he wrote, "It is being disputed in the courts but some cases seem to merit the death penalty." He indicated he was moderately in favor of the death penalty.

During voir dire, J.M. said he didn't like "having to be called every year and come and sit in jury duty." When asked if he could think of any specific instances of prosecutors trying to convict regardless of guilt, he said, "I've heard that there are prosecutors that . . . receive their reputation and their career status based on whether or not they win cases. And there have been media reports that in some cases it's a tactic for prosecutors to withhold evidence that could even bring about nonconviction of a particular person that they're prosecuting." With respect to plea bargaining, he said that "sometimes people are given the opportunity to

110

plea bargain and they end up going to jail for crimes they didn't actually commit because they were threatened with . . . they were not going to get off at all, and so in some cases it denies them their rights." When asked why he thought the last defense attorney he witnessed did a poor job, J.M. explained that the defense attorney "did not present any defense at all." With respect to his racial attitudes or prejudices, J.M. said, "Well, in America race prejudice exists, and as a black person or minority person growing up, you usually experience it, and I have experienced it. And it's no secret. It's a fact of American life."

The prosecutor challenged J.M. for cause on the ground that he was "so hostile to the judicial system and prosecutors and law enforcement that he cannot give the People a fair trial." He noted that J.M. had expressed a "distrust of the legal system," that he believed that "prosecutors want to convict regardless of the evidence," and that he had "sat as a juror in a case and hated it." Asked for his views, defense counsel responded, "I'll submit it on him as well." The trial court denied the prosecutor's challenge for cause, reasoning that J.M.'s "answers were sufficient that I can't, in good conscious [sic] under the law, grant a challenge for cause." The trial court noted, however, that he personally "would be afraid to have him no matter which side of the table I was sitting on" and suggested that one side "challenge him preemptorily." The trial court credited the prosecutor's concerns regarding J.M. as "totally race neutral." In light of J.M.'s written and oral responses, which revealed a degree of hostility to law enforcement and the judicial system not comparable to what had been expressed by any other juror, we find that the trial court's assessment was supported by substantial evidence.

3. Juror Misconduct

Defendant contends that the "[trial] court's failure to investigate whether a juror slept through crucial portions of the trial proceedings denied [defendant] his

111

right to have his trial heard and decided by an impartial and competent jury in violation of the Sixth Amendment." We disagree.

a. *Factual Background*

During defense counsel's cross-examination of prosecution witness Robert Scott, the prosecutor approached the trial court and reported that a trial spectator had told him she believed that Juror No. 6 had been sleeping during the testimony. The trial court responded: "I've been watching, and I didn't really pick up on it. But I hadn't been staring." At the suggestion of defense counsel, the trial court questioned the spectator directly and asked her what she had observed. The spectator responded: "Well, I observed that in its entirety he has nodded off. He's been — a couple of times when he was nodding off, he was actually asleep. At first I wasn't really sure because a lot of times people listen with their eyes closed. I thought that might be the case. But trust me, that is not the case. . . . [¶] I noticed it already today. I mean, it's early. It's not after lunch. You know, he was already nodding off, you know. And the testimony to me — every day the testimony to me was not dry, just drawn out, where you might nod off, you know. It's every day. And I'm not the only one who has noticed. . . . [¶] I'm not the only one who has noticed. I'm not the only spectator who has noticed. . . . [¶] I just really don't think that it is fair to the defense or the prosecutor's case. I really don't think that is fair." Neither the prosecutor nor defense counsel accepted the trial court's invitation to further question the spectator.

The trial court then noted for the record that Juror No. 6 was African American and asked defense counsel what he would like to do. Defense counsel responded: "I think a general admonition, to make sure that everybody pays attention, is alert throughout the proceedings." The trial court agreed to provide the admonition and also instructed its deputy to keep an eye on the jury. The

prosecutor agreed that an admonition would be sufficient. The trial court and defense counsel then engaged in the following exchange:

"THE COURT: And, Mr. Cormicle, I don't know if you've been watching the jurors. Probably not as much as the [spectator] has, but do you feel that your client's rights have been sacrificed by keeping that juror?

"MR. CORMICLE: No. But I can also say that I have not been watching the jury so I cannot say — I cannot weigh this one way or the other.

"THE COURT: I haven't been — obviously haven't been watching them as close as [the spectator] has. [¶] Waive any defect? I know I'm asking you a tough question, but I have to, I think.

"MR. CORMICLE: Yes. My suggestion is to keep quiet.

"THE COURT: I think so. Any issue of whether he was asleep or not, you're willing to waive that at this point?

"MR. CORMICLE: Yes.

"THE COURT: And Mr. Williams agrees with you? . . . [¶] Mr. Williams, waive — counsel waive any defect or prejudice, if, in fact, he was dosing [*sic*] off? Waive any defect or prejudice?

"THE DEFENDANT: No comment.

"MR. RUIZ: Well, I think we have to make a factual basis.

"THE DEFENDANT: I agree.

"THE COURT: I'm sorry, sir?

"THE DEFENDANT: I agree.

"THE COURT: You waive any defect or any claim of prejudice that, in fact, this juror was dosing [*sic*] off on occasion?

"THE DEFENDANT: To this point, yeah."

When the jury returned to the courtroom, the trial court issued the following admonition: "Ladies and gentlemen, I'm going to ask you to keep your

113

eyes open.  The reason I say that is because it's important that all jurors stay awake.  And I can't tell if somebody is dosing [*sic*] off if they have their eyes closed, or when they're really just listening with their eyes closed.  I just caution you that sometimes trials get a little bit boring.  Maybe you have noticed.  And I'm being very generous now.  [¶] I just ask you to please keep your eyes open and stay awake.  Okay?"

> b.    *Analysis*

As indicated by the exchange between the trial court and defense counsel, defense counsel neither objected to Juror No. 6's continued service nor requested a mistrial on the ground of juror misconduct.  Not only did defense counsel fail to object, he expressly waived any defect, affirmatively requested the procedure followed by the trial court, and indicated that his client's interests would be best served by a general admonition to the jurors to pay attention.  Accordingly, defendant has forfeited his claim of juror misconduct.  (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1308; *People v. Stanley* (2006) 39 Cal.4th 913, 950.)

In any event, the claim fails on the merits.  "A trial court may discharge a juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty, . . .'  [Citation.]  Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged.  [Citation.]  We have . . . explained, however, that the mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case."  (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.)

" ' "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court.  [Citation.]  The court does not abuse its discretion simply because it fails to investigate any and all new

114

information obtained about a juror during trial." ' [Citation.] A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348.)

*People v. Bradford*, *supra*, 15 Cal.4th 1229, is instructive. In *Bradford*, the trial court acknowledged on the record that a juror was asleep and had been asleep the previous day. We stated: "We have observed that '[a]lthough implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. In fact, not a single case has been brought to our attention which granted a new trial on that ground. Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. [Citations.]' [Citation.]" (*Id.* at p. 1349, quoting *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411.) We held that "[a]lthough the duty to *inquire* as to juror misconduct is activated by a lower threshold of proof, in the present case the absence of any reference in the record to the juror's inattentiveness over a more substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry." (*Ibid*.; see *People v. Espinoza*, *supra*, 3 Cal.4th at p. 821 [concluding that defense counsel's speculation that a juror might have been sleeping was insufficient to apprise the trial court that good cause might exist to discharge the juror and therefore did not obligate the court to conduct further inquiry].)

Under the circumstances in this case, the spectator's assertion that Juror No. 6 had been "nodding off" was insufficient to apprise the trial court that good cause might exist to discharge him. The trial court had been observing the jurors' behavior and had not noticed Juror No. 6 sleeping. After hearing the spectator's observations, neither the defense nor the prosecution asked the trial court to investigate further. Additionally, after admonishing the jury to remain attentive, the trial court instructed its deputy to keep an eye on the jurors for the remainder of the trial, and no further incidents were reported. (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1233–1234 [concluding that the trial court's "self-directed inquiry," which involved observing several jurors closely to determine whether they were asleep and determining that none was dozing, was sufficient and that a formal hearing was not required under the circumstances].) Under these circumstances, the trial court did not abuse its discretion in declining to conduct a formal hearing into juror misconduct.

## H. Cumulative Error

Defendant contends the cumulative effect of the asserted guilt phase errors was prejudicial. However, there was no error to accumulate. (See *People v. Beeler* (1995) 9 Cal.4th 953, 994.)

## I. Penalty Phase Issues

### 1. Excusal of Juror Prior to Penalty Phase

Defendant contends that the trial court "erred in excusing Juror No. 1 and substituting an alternate juror following the guilt phase and prior to the penalty phase of the trial without having established that [the juror's] illness rendered him unable to perform his duties as a juror, thereby denying [defendant] his right to have his trial heard and decided by an impartial and competent jury in violation of the Sixth Amendment, and depriving him of due process of the law in violation of the Fourteenth Amendment."

116

a.       *Factual Background*

Following the guilt phase, the jury returned a verdict of guilty on September 17, 2002.  The trial court declared a recess and ordered the jurors to return on October 15, 2002 for the penalty phase of the trial.  On October 15, 2002, all jurors returned for service with the exception of Juror No. 1.  The court clerk informed the trial court that she had received a telephone message, left the day before, in which Juror No. 1 said he had stepped on a nail and his foot had become badly swollen.  He said he was unable to walk, had a doctor's appointment he needed to attend, and wished to be excused from jury service.  He said he would call the court in the morning and fax a letter from his doctor.

As of the morning of October 15, 2002, the trial court had not received the faxed letter from Juror No. 1's doctor.  The trial court therefore ordered a recess and asked the clerk to call juror No. 1 for an update on his status. Following the recess, the clerk reported that she had left Juror No. 1 a voicemail message requesting that he contact the court immediately.  The trial court again released the waiting jurors and ordered them to return that afternoon.

The trial court called the matter back to order at 1:30 p.m. on October 15, 2002.  With the jury waiting outside the courtroom, the clerk reported that she had made contact with Juror No. 1.  He had reported to her that his foot had become infected, a condition known as osteomyelitis, and that his doctor was considering admitting him into the hospital for purposes of initiating intravenous therapy and conducting a bone scan.  The clerk also said that when she had asked about the letter from his doctor, Juror No. 1 had said that the letter was in his possession and that he would be able to fax it to the trial court the following day.

Defense counsel requested that proceedings be suspended until the parties received "some idea when [the juror might] return."  The trial court disagreed, explaining:  "[W]e don't have the doctor's report, but I know I have no reason to

disbelieve the juror when he says that he has to go in the hospital or go into the doctor tomorrow for the procedure . . . . [¶] Which means, number one, he's not here today. Number two, he won't be here tomorrow. And we anticipated — told the jury we were going to get done tomorrow. I am going to substitute Alternate No. 1 in for Juror No. 1 and relieve Juror No. 1."

        b.    *Analysis*

Section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

"Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 821.) "We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality. [Citations.] The demonstrable reality test 'requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established.' [Citation.] To determine whether the trial court's conclusion is 'manifestly supported by evidence on which the court actually relied,' we consider not just the evidence itself, but also the record of reasons the court provided. [Citation.] In doing so, we will not reweigh the evidence." (*People v. Wilson* (2008) 43 Cal.4th 1, 26.)

118

Defendant claims that the trial court did not conduct an adequate inquiry to determine whether it was necessary to discharge Juror No. 1 because it did not wait for the doctor's letter to be faxed to the court or speak to the doctor directly. But the juror's absence from court, combined with his recorded telephone message explaining his absence and his telephone call with the clerk the following day, was adequate to inform the trial court why he was not present and the reason for his absence. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410.) The record supports the juror's disqualification for illness as a demonstrable reality, and no further inquiry was required under the circumstances. We have reached the same conclusion under similar circumstances. (*Id.* at pp. 1409–1410 [upholding the trial court's decision to dismiss a juror over the objection of both the prosecutor and defense counsel after the juror had left a message explaining that his father-in-law had died and after the court clerk spoke to the juror's wife over the telephone].)

Defendant does not explain his claim that the discharge of Juror No. 1 violated the federal Constitution. We have held, however, that section 1089 "does not offend constitutional proscriptions." (*People v. Collins* (1976) 17 Cal.3d 687, 691.) "Thus, our conclusion that the trial court did not violate that statute necessarily disposes of [defendant's] constitutional claim[]." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1410.)

2.     Request to Modify CALJIC No. 8.88

Defendant argues that the trial court's "refusal to instruct the jurors that they must be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors prior to imposing the death penalty violated the cruel and unusual punishment clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment, in that the jurors were not provided that 'guided discretion' essential in making the capital determination." (Quoting *Gregg v. Georgia* (1976) 428 U.S. 153, 189.)

119

Defense counsel requested that the jury be instructed with defense Special Instruction No. 7, which stated in part: "After considering all of the evidence it is entirely up to you to determine whether you are convinced that the death penalty is the appropriate punishment." The prosecutor objected to this instruction, arguing that the use of the word "convinced" constituted a misstatement of law. The trial court agreed with the prosecutor. Defense counsel then asked the trial court to give the following instruction instead: "It is entirely up to you to determine whether the death penalty is the appropriate punishment." The trial court gave the requested instruction to the jury.

The trial court also instructed the jury with CALJIC No. 8.88, which defines the scope of the jury's sentencing discretion and provides in relevant part: "The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Defendant acknowledges that we have repeatedly held that "CALJIC No. 8.88 provides constitutionally sufficient guidance to the jury on the weighing of aggravating and mitigating factors." (*People v. Howard* (2010) 51 Cal.4th 15, 39; see, e.g., *People v. Butler* (2009) 46 Cal.4th 847, 873–875; *People v. Geier* (2007) 41 Cal.4th 555, 618–619.) We have rejected the claim that the instruction

120

unconstitutionally fails to inform the jury that, in order to impose the death penalty, it must find that aggravating circumstances outweigh mitigating ones beyond a reasonable doubt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124.) Under our precedent, "the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase." (*People v. Blair* (2005) 36 Cal.4th 686, 753.) Thus, the trial court's instruction was proper, and the trial court did not err in refusing to give defense Special Instruction No. 7.

## J.      Miscellaneous Challenges to the Death Penalty

Defendant mounts a number of challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no persuasive reason for us to reexamine those conclusions, and we therefore reject them as follows:

California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment. (*People v. Loker* (2008) 44 Cal.4th 691, 755.) Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment. (*People v. Farley* (2009) 46 Cal.4th 1053, 1133; see also, e.g., *People v. Zamudio* (2008) 43 Cal.4th 327, 373; *People v. Prieto* (2003) 30 Ca1.4th 226, 276.)

"Section 190.3, factor (a), which allows the jury to consider, in choosing the appropriate penalty, '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Eighth or Fourteenth Amendments to the United States Constitution merely because those circumstances differ from case to case, or because factor (a) does not guide the jury in weighing these circumstances." (*People v. Farley*, *supra*, 46 Cal.4th at p. 1133, citing *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976,

121

978–979; see *People v. Stevens* (2007) 41 Cal.4th 182, 211.) Section 190.3 "does not license the arbitrary and capricious imposition of the death penalty." (*People v. Nelson* (2011) 51 Cal.4th 198, 225.)

"Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty. [Citations.] This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296." (*People v. Nelson*, *supra*, 51 Cal.4th at pp. 225–226; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 848 [same]; *People v. Lewis*, *supra*, 46 Cal.4th at p. 1319.)

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50–51; *People v. Butler*, *supra*, 46 Cal.4th at p. 885.)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (*People v. Jennings* (2010) 50 Cal.4th 616, 690; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243.)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (*People v. Mills* (2010) 48 Cal.4th 158, 215; *Butler*, *supra*, 46 Cal.4th at p. 885; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1059.)

Defendant also complains that the cumulative impact of the alleged deficiencies in California's capital sentencing scheme render California's death penalty law constitutionally infirm. We have individually rejected each of defendant's challenges to California's death penalty law, and "[s]uch claims are no more compelling . . . when considered together . . . ." (*People v. Garcia* (2011) 52 Cal.4th 706, 765.)

Defendant appears to make one new argument. He contends that the United States Constitution forbids the imposition of the death penalty when the system generates an unacceptably high number of wrongful convictions. According to defendant, because new techniques such as DNA testing have demonstrated that false convictions are far more common than previously assumed, the Eighth Amendment "requir[es] that proof of guilt in [capital cases] be beyond all doubt."

As defendant acknowledges, however, the federal district court opinions on which he primarily relies — *United States v. Quinones* (S.D.N.Y. 2002) 196 F.Supp.2d 416 (*Quinones I*), and *United States v. Quinones* (S.D.N.Y. 2002) 205 F.Supp.2d 256 (*Quinones II*) — were reversed on appeal. The defendants in *Quinones* had argued that the Federal Death Penalty Act of 1994 (FDPA) (Pub. L. No. 103–322, tit. VI, §§ 60001–60026, 108 Stat. 1959 (Sept. 13, 1994) codified at 18 U.S.C. §§ 3591–3598) was unconstitutional because DNA testing had demonstrated that "innocent people are convicted of capital crimes with some frequency." (*Quinones I*, *supra*, 196 F.Supp.2d at p. 420.) The United States Court of Appeals for the Second Circuit rejected this argument as follows: "We hold that, to the extent the defendants' arguments rely upon the Eighth Amendment, their argument is foreclosed by the Supreme Court's decision in *Gregg v. Georgia*, 428 U.S. 153 (1976). With respect to the defendants' Fifth Amendment due process claim, we observe that the language of the Due Process Clause itself recognizes the possibility of capital punishment. Moreover, the

defendants' argument that execution deprives individuals of the opportunity for exoneration is not new at all — it repeatedly has been made to the Supreme Court and rejected by the Supreme Court. Most notably, the Supreme Court expressly held in *Herrera v. Collins*, 506 U.S. 390, 407–08, 411 (1993), that, while the Due Process Clause protects against government infringement upon rights that are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' there is no fundamental right to a continued opportunity for exoneration throughout the course of one's natural life." (*United States v. Quinones* (2d Cir. 2002) 313 F.3d 49, 52.)

In arguing that the Eighth Amendment requires proof of guilt in capital cases beyond all doubt, defendant essentially contends that capital punishment is unconstitutional per se, for no humanly administered system of justice can claim to be absolutely infallible. But the United States Supreme Court considered and rejected this argument in *Gregg v. Georgia*, *supra,* 428 U.S. 153, holding that the death penalty is not unconstitutional per se under the Eighth Amendment. (See *id.* at pp. 176–187 (plur. opn. of Stewart, J.); *id.* at p. 226 (conc. opn. of White, J.).) Further, even if the federal Constitution were to protect a condemned inmate from execution upon an "extraordinarily high" threshold showing of actual innocence (*Herrera v. Collins* (1993) 506 U.S. 390, 417 [assuming this point for the sake of argument]), that is not the same as a constitutional right to have guilt in capital cases be proven beyond all doubt. Because the high court has upheld the death penalty "despite a clear recognition of the possibility that, because our judicial system — indeed, any judicial system — is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration" (*United States v. Quinones*, *supra*, 313 F.3d at p. 65), defendant's Eighth Amendment challenge does not succeed.

124

## CONCLUSION

For the reasons above, we affirm the judgment.


LIU, J.


WE CONCUR:  CANTIL-SAKAUYE, C. J.
                  KENNARD, J.
                  WERDEGAR, J.
                  CORRIGAN, J.

**CONCURRING OPINION BY BAXTER, J.**

The majority correctly observes that "[b]ecause defendant did not file a motion to dismiss on speedy trial grounds in the trial court, the underlying cause of the delay in this case was never litigated, the various statements by defendant and his attorneys were never examined in an adversarial proceeding, and the trial court made no findings that might inform the issue before us." (Maj. opn., *ante*, at p. 58.) In particular, we are unable on this record to conclude "that responsibility for the discovery disputes should be attributed to the prosecution" or "that the delay experienced by defendant resulted from a breakdown in the public defender system." (*Id*. at pp. 45, 59.)

For the same reasons, the majority ought to refrain from asserting that counsel did not "work[] diligently on defendant's case" and that "the lion's share of delay resulted from defense counsel's lack of progress in preparing the case for trial." (Maj. opn., *ante*, at p. 47.) Because the majority nonetheless purports to make such a finding for the first time on appeal, I am compelled to write separately.

The majority's purported finding as to counsel's performance rests almost entirely on statements by defendant and his attorneys made in ex parte proceedings (maj. opn., *ante*, at pp. 48-52) and on the asserted failure of the appellate record to detail the work product completed by counsel in preparation for trial (*id*. at pp. 50-51). But one would hardly expect to discover a log of an attorney's investigation

1

(or the fruits thereof) in a reporter's transcript or clerk's transcript of pretrial proceedings or in "[t]he table of contents for all records" filed at the pretrial stage. (*Id*. at p. 50.)  Moreover, as with the statements of defendant and his attorneys concerning the role of the prosecution and the public defender system in delaying the start of trial, the statements of defendant and his attorneys concerning counsel's diligence and progress "were never examined in an adversarial proceeding," "the underlying cause of the delay in this case was never litigated," and "the trial court made no findings that might inform the issue before us." (*Id*. at p. 58.)  Uncritical reliance on these statements, which were made at ex parte hearings where the People were excluded (and were not even granted the opportunity to submit questions that the trial court could then pose to the defense in camera), would be a denial of the People's right to due process under the California Constitution.  (Cal. Const., art. I, § 29; cf. *Department of Corrections v. Superior Court* (1988) 199 Cal.App.3d 1087, 1093.)

The problem with the factual finding purportedly made by the majority is exacerbated by the existence in the record of contrary evidence that counsel *was* proceeding diligently and *did* make progress during at least some of the relevant time periods.  Attorney Forest Wright stated that " 'there's been a considerable amount of work done' " (maj. opn., *ante*, at p. 48), that "he was proceeding 'as diligently as [he could] at this point,' " and that " 'a lot has been done in this matter' "—even though defendant had been " 'a little bit stingy with his information at times.' " (*Id*. at pp. 13-14.)  In 1999, after Wright had withdrawn, attorney David Gunn said that the defense was " 'on track.' " (*Id*. at p. 23.)  Although these statements, too, were "never examined in an adversarial proceeding" and "the trial court made no findings that might inform the issue before us" (*id*. at p. 58), they do tend to support the judgment of the trial court and undermine the majority's purported factual finding that counsel did not work

2

diligently on the case and that the delay was counsel's fault. Had the parties been able to litigate the issue, the trial court might well have agreed with the investigator who, after working with defendant for many months, declared that it was " 'impossible' " to work with him. (*Id.* at p. 28.)

When presented with conflicting evidence on review of a judgment of conviction, our task is clear and well settled. "On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) The presumption being in favor of the judgment, " '[w]e must consider the evidence in the light most favorable to the prevailing party, giving such party the benefit of every reasonable inference, and resolving all conflicts in support of the judgment.' " (*Gooch v. Hendrix* (1993) 5 Cal.4th 266, 279.) The standard of appellate review has particular salience here, inasmuch as the burden to establish a speedy trial violation falls on defendant (maj. opn., *ante*, at p. 37) and the presumption is that counsel performed in a competent and timely manner. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Accordingly, the majority's purported factual finding that counsel was responsible for the delay is without factual or legal foundation.

I agree that defendant's speedy trial claim is without merit, but I do not agree with the majority's analysis of the claim. I therefore concur in the judgment.

BAXTER, J.

I CONCUR:

CHIN, J.

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Williams

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S118629
**Date Filed:** December 19, 2013

_____

**Court:** Superior
**County:** Riverside
**Judge:** Dennis A. McConaghy

_____

**Counsel:**

H. Mitchell Caldwell, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, James H. Flaherty III and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

H. Mitchell Caldwell
6240 Tapia Drive, Unit E
Malibu, CA  90265
(310) 506-4669

Robin Urbanski
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2196